THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
GEORGE BENITEZ, Appellant.

First Department, July 10, 1980

## APPEARANCES OF COUNSEL

*Raymond J. Aab* of counsel *(George R. Mayer,* attorney), for appellant.

*Kenneth Larywon* of counsel *(Alan D. Marrus* with him on the brief; *Mario Merola, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

BIRNS, J.

 The actions of police officers in seizing evidence in defendant's apartment without a warrant and without consent and thereafter questioning the defendant who was represented by counsel in a criminal proceeding requires reversal and a new trial.

At trial, the defendant was identified as one of three men who participated in a robbery of a real estate office located on the Grand Concourse in the late afternoon of April 11, 1977.

Three of the victims identified the defendant as the robber wielding a sawed-off shotgun with a black taped stock. On April 21, 1977 the police obtained entry into the apartment the defendant occupied with Ms. Richardson and in a closet found a sawed-off shotgun with a black taped stock. This weapon was admitted into evidence at trial. Also received in evidence was a statement attributed to the defendant while in police custody. The statement was made on the way back from a Bronx lineup to a Westchester County jail where the defendant was being held on another charge and there represented by counsel.

At the suppression hearing Detective Harnett testified that the defendant told him on the night the police entered his apartment "he did not jump out the window that night because he was worried about me [Harnett] catching him for this robbery, but he thought it was parole officers." At the trial the statement was redacted to give it benign effect: "[H]e didn't jump out the window that night because he was worried about this robbery but because he thought someone else was after him."

The court erred in not suppressing the shotgun and the statement.

The evidence at the hearing disclosed that for three days prior to their entry into the apartment, the police knew that the defendant resided there. In fact, Detective Harnett had actually been in the apartment prior to April 21, 1977, to verify that the defendant lived there with Ms. Richardson. On April 21, at 2:30 A.M., the police, without a warrant, entered the apartment to effect defendant's arrest. An armed officer was stationed on the roof of the building to prevent defendant's escape through the apartment window. However, this strategy was unsuccessful, as the defendant eluded the police. In the apartment the police seized the shotgun.

██ Although a warrant is now required for police to enter a home to arrest for a felony, absent exigent circumstances or consent (*Payton v New York,* 445 US 573; *Riddick v New York,* 445 US 573),[1] the police entry was authorized at the

---

1. These decisions declared unconstitutional CPL 140.15 (subd 4) and its predecessor section 178 of the Code of Criminal Procedure. Said sections provided, in effect, that a police officer may without a warrant enter premises to arrest a person within, in the same manner as if the officer were attempting to make an arrest pursuant to a warrant.

time.[2] Nevertheless, the ensuing search of the premises and the seizure of the shotgun were required to conform to constitutional requirements (US Const, 4th and 14th Amdts; NY Const, art I, § 12) which could only be met by a warrant authorizing the search or consent by the occupant of the apartment. The District Attorney claims Ms. Richardson consented to the entry and the ensuing search of the apartment. The testimony established that Detective Harnett, accompanied by another officer, was at the apartment door with his weapon drawn. He knocked on two occasions before Ms. Richardson opened the door and he obtained entry. By this time Detective Harnett had learned by radio that someone was leaving the apartment through the window. After a fruitless search for the defendant in the apartment, Detective Harnett reholstered his weapon. The District Attorney asserts that Detective Harnett and other officers were told then by Ms. Richardson that they could have anything in the apartment belonging to the defendant. The shotgun was found in a suitcase in a closet.

Although Ms. Richardson had the right to permit the police to enter and search the apartment *(People v Cosme,* 48 NY2d 286; *People v Wood,* 31 NY2d 975), "the burden of proof rests heavily upon the People to establish the voluntariness of that waiver of a constitutional right" *(People v Whitehurst,* 25 NY2d 389, 391),[3] that is, "that the consent was, in fact, freely and voluntarily given" *(Bumper v North Carolina,* 391 US 543, 548; *People v Kuhn,* 33 NY2d 203, 208; *People v Brown,* 77 AD2d 537, decided herewith).

It strains credulity to the breaking point to find, in this case, that the consent was "freely and voluntarily given."

The circumstances of the police entry and the ensuing search are detailed in the dissent. There is no dispute that the police entered Ms. Richardson's apartment with drawn weapons and unsuccessfully searched the rooms for the defendant.

---

[3] 2. We do not hold *Payton v New York* and *Riddick v New York* to be retroactive because it cannot be said that "the major purpose of [this] new constitutional doctrine is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function." (See *Ivan V. v City of New York,* 407 US 203, 204, and other cases cited in *People v Getch* and *People v Marr,* 50 NY2d 456.)

3. A number of States "use a higher standard of proof, using such phrases as 'clear and positive proof' and 'clear and convincing evidence' " in an effort to apply a measurable standard (see Ringel, Searches & Seizures, Arrests and Confessions, 2d ed, § 9.6). In any event, the use of the word "heavily" connotes a great weight or burden (American Collegiate Dictionary), despite the amorphous quality of the word.

Only when satisfied that the defendant was not present were the police weapons reholstered and further questioning of Ms. Richardson continued. Then followed the search of the closet upon her "consent."

"Consent to search is voluntary when it is a true act of the will, an unequivocal product of an essentially free and unconstrained choice. Voluntariness is incompatible with official coercion, actual or implicit, overt or subtle [citing cases]. 'Where there is coercion there cannot be consent' " *(People v Gonzalez,* 39 NY2d 122, 128).

We do not find that consent was not obtained simply because the police were armed when they entered the apartment in the early morning hours. There was more than the "knock on the door" at 2:30 in the morning. There was not only entry of armed police but the presence of "walkie-talkies" in the apartment and surrounding areas, the search of the rooms for the defendant, the removal of Ms. Richardson's child from a bedroom before the police went into that room, the possibility of an imminent shoot-out within the apartment, and the questioning of Ms. Richardson as to the location of defendant's "stuff." In addition, there was testimony that Ms. Richardson was "excited" and was "told to calm down."

"[T]he ineluctable inference * * * is that the consents could not be, on any creditable view of the [police officer's] testimony, the product of a free and unconstrained choice." The consent, if any, was more consistent with "awe" than with free choice *(People v Gonzalez, supra,* p 129). In these circumstances, unlike the hearing court, we find as a fact that the People failed to meet the heavy burden to show that consent was freely and voluntarily given.[4]

■ In addition, we cannot find, as did the hearing court, that the statement attributed to the defendant was voluntarily made.

The pertinent portion of the suppression hearing reflects that the defendant was carrying on a conversation with the detectives in the car about the robbery as he was being returned to the Westchester County jail. There were three

4. The record does not contain any specific finding by the hearing court that Ms. Richardson consented to the search. Such finding, however, is implicit in the record because the court denied the motion to suppress. We note that on a number of occasions the hearing court deplored the failure of the police to obtain a search warrant during the three days that Detective Harnett had information as to the location of the defendant.

detectives present, one of whom the defendant knew. While the District Attorney seeks to show that defendant's statement was voluntarily made in casual conversation with the detectives, the record is unsupportive. The defendant on the journey to and from the lineup was asked about this particular robbery and other robberies. While defendant's statement was not in response to a direct question, it was the product of subtle interrogation and as such was not spontaneous (see *People v Garofolo,* 46 NY2d 592, 603-604; *People v Maerling,* 46 NY2d 289, 301-302).

Even though edited to give it benign effect, the tenor of the statement that the defendant "didn't jump out the window that night because he was worried about this robbery but because he thought someone else was after him" invited the jury to speculate on the kind of person the defendant would fear.

This case can be distinguished from *People v Lynes* (49 NY2d 286). In finding that defendant's admission was spontaneous, the Court of Appeals noted that the defendant initiated the short conversation with an escort officer who knew nothing about the pending charges. In this case, Detective Harnett, who was investigating the defendant, took an active part in the conversation, apprising the defendant of certain facts concerning the case.

Therefore, the statement by the defendant was not a response to an incidental comment by the police. Rather, it was the result of "words or actions on the part of the police * * * that the police [knew were] reasonably likely to elicit an incriminating response from the suspect." (See *Rhode Is. v Innis,* 446 US 291.)

Moreover, in *People v Rogers* (48 NY2d 167, 173) the Court of Appeals declared "that once a defendant is represented by an attorney, the police may not elicit from him any statements * * * Nor may they seek a waiver of this right, except in the presence of counsel * * * even when the interrogation concerns unrelated matters". While the District Attorney urges that this decision does not bear on this statement because the hearing court reached its conclusion "in accordance with the then well-settled law of the State," the *Rogers* opinion states that "[o]ur acknowledgment of an accused's right to the presence of counsel, even when the interrogation concerns unrelated matters, represents no great quantitative change in the protection we have extended to the individual"

(p 173). In the case at bar, the defendant testified that he was represented by counsel on the Westchester charges, and that he so informed Detective Harnett prior to the statement. The record supports the conclusion that Detective Harnett knew that the defendant was represented by counsel on the way to the lineup. In any event, the precise point at which this information was imparted to Detective Harnett is irrelevant (see *People v Rogers, supra; People v Arthur,* 22 NY2d 325).

In view of the above discussion, it is unnecessary to consider the other points raised on this appeal.

Accordingly, the judgment of the Supreme Court, Bronx County (BELL, J. and a jury), rendered May 29, 1978, convicting the defendant of three counts of robbery in the first degree and sentencing him to three concurrent terms of imprisonment from 9 to 18 years to run consecutively to any undischarged period of incarceration which defendant was subject to serve under a separate Westchester County conviction, should be reversed, on the law and the facts, the shotgun seized by the police and the statement attributed to the defendant suppressed, and a new trial ordered.

LUPIANO, J. (dissenting). Patently the shotgun seized by the police was properly not suppressed by the hearing court at the suppression hearing and was properly admitted into evidence at trial. On April 14, 1977, a victim identified defendant as one of the robbers who had participated in the April 11, 1977 robbery of a Bronx real estate office. The police were able to trace defendant to No. 2326 Lorring Place and made several trips to the location in an unsuccessful endeavor to apprehend defendant. In consequence, they learned from the building superintendent that defendant lived in apartment 4E. At the time the superintendent identified the photograph of defendant as an occupant of apartment 4E, the lessee of the apartment, Ms. Patrice Richardson, was entering the building premises. The superintendent pointed her out to Detective Harnett and his fellow officer and called her attention to the presence of the police. Under the misapprehension that the police were inquiring about a dispute she had with a neighbor prior thereto, Ms. Richardson invited them to her apartment. The police did not inform her of the true nature of their presence, to wit, the location and apprehension of defendant.

Subsequently, on April 21, 1977, in the early morning (about 2:30 A.M.) Detective Harnett and two fellow officers went to the apartment to arrest the defendant. Detective

Rosenthal positioned himself on the roof to cover the fire escape. Harnett knocked on the door and observed movement on the other side of the door's peephole, i.e., he saw that someone had come to the door and quietly moved the doorhole covering to one side. Thereafter he heard movement within the apartment and a window being opened. Rosenthal, on the "walkie talkie", announced that individuals were exiting the apartment by the window. The officers at the door drew their guns. Harnett knocked on the door again, while Detective McCarren went downstairs to try to cover the fire escape from the bottom. Patrice Richardson, defendant having fled the premises, now "answered the door", which was described as being of metal, and Harnett identified himself as the police through the closed door and requested entry. Ms. Richardson thereupon opened the door. It should be noted at this point that prior to opening the door, Ms. Richardson's will was not coerced or overborne in any fashion by virtue of the fact that Detective Harnett had drawn his gun and stood to one side as a safety measure, because the closed door which contained a peephole separated this physical action from her knowledge. Also, common sense dictates that defendant and his companion(s) having fled, there was no compulsion on Ms. Richardson from within the apartment to refuse entry to the police. She knew defendant had fled, because she specifically therafter pointed out to the police the window used to effectuate the escape.

To Detective Harnett's question—"Where is George?" (the defendant), she responded—"He's not here." As the officer entered the apartment, Ms. Richardson voiced no objection and did not endeavor in any manner to impede or refuse such entry. Her *immediate* exclamation under these circumstances was: "He's not here. They're not here. I don't want to be involved in anything. *I'm glad they're gone."* Alerted to the fact that there had been another occupant of the apartment apart from defendant and Ms. Richardson, the officer checked to see if, in fact, defendant and another, or others, had indeed fled the apartment. Ms. Richardson, understandably upset, called her mother and volunteered to the police that when they were at the apartment on the prior occasion, she thought it was about the dispute she had with a neighbor, but that when she told the defendant of this meeting with the police, the defendant informed her that she was crazy and that the police had come at that time to lock defendant up. Ms.

Richardson accompanied the detective when he entered the back bedroom to ascertain if defendant and his unknown companion(s) had indeed fled, and the two engaged in continuous conversation. Ms. Richardson, upon inquiry as to where defendant kept "his stuff," replied that he kept it in the hall closet.

Two officers from a backup unit which had arrived at the scene went to the apartment and were admitted. Ms. Richardson directed the police to the hall closet, declaring "[t]hat's his closet. *You could take all of his stuff out of here. I don't want nothing to do with this anymore.*" At this time, and subsequent to having ascertained that defendant had indeed left the apartment, Detective Harnett had returned his gun to its holster. The police from the backup unit also did not enter the apartment with drawn guns. Inside the unlocked closet and as indicated by Ms. Richardson, the police discovered defendant's unlocked suitcase which contained a shotgun and cartridges for same. Ms. Richardson identified this property as belonging to defendant.

Detective Harnett further testified that the police went at night on this occasion to attempt to arrest defendant because their prior three daylight visits had been unsuccessful. Information supplied them by the superintendent and others in the building, in addition to other sources, convinced them that defendant resided at the apartment, but was not there during the day. When they went to the apartment premises, the police were conventionally armed and did not carry shotguns or any other antipersonnel weapons. In knocking on the door Detective Harnett and his fellow officer each stood to one side of the door with drawn gun as a safety precaution.

Under the recent United States Supreme Court decision, *Payton v New York* (445 US 573), a warrant is *now* required for the police to effectuate an arrest of an individual in that individual's home absent exigent circumstances or consent of any occupant of the premises.[1] Exigent circumstances are not

---

1. While *Payton v New York* (445 US 573) is a 6-to-3 determination in terms of the votes and views of the Justices, the historical exegesis expressed in the dissenting opinion of Mr. Justice WHITE impressed this writer as most cogent. Of course, the objective aspect of historical reality may be imbued with or impugned by the subjective, the interpretative aspect. However, the clarity of Mr. Justice WHITE's recapitulation of the historical predicate underlying the majority position emphasizes the objective as compared with the subjective, and to that extent reflects favorably on the dissenters' conclusion. Nevertheless, the majority view in *Payton* is now the law of the land and will be so considered and applied.

a factor in this appeal, apart from the fact that defendant had used a sawed-off shotgun in the robbery and could be presumed to still possess same.[2] The critical issue is thus whether the police obtained the voluntary consent of an occupant of the apartment to enter. Of course, involuntary consent is, in fact, no consent. On this record it is clear that such consent was obtained, and I disagree most strongly with the majority's view that such consent was not obtained *simply* because the police were armed when they entered the apartment and did so in the early hours of the morning. The majority postulate, *inter alia,* that the presence of "walkie-talkies," the search of the rooms for the defendant and his cohort(s), the removal of Ms. Richardson's child from the bedroom before the police went into that room, the possibility of a shoot-out—all constitute the predicate for the mandated "ineluctable inference" that consent to search was not fully given. The issue of consent to entry has apparently been resolved, the majority concluding that the police entry was authorized at the time. Thus, the critical issue is the consent to search.

It is difficult to perceive the intrinsic relationship of these facts to the conclusion that consent was not freely given. These facts are all consonant with the standard of reasonableness as applied to proper police conduct under the circumstances and would be present in any event, i.e., whether or not a warrant to arrest or to search had been obtained. There is always the possibility of a shoot-out when the police endeavor to arrest a criminal whose past criminal conduct has exhibited the use of a weapon such as a sawed-off shotgun. Here, the possibility in the eyes of Ms. Richardson (it is her freedom of will and action with which we are concerned, not that of the police) of a shoot-out was rendered remote since she was inside the locked apartment and privy to events going on inside which knowledge did not pertain to the police. Thus she informed the police, i.e., imparted *her* knowledge to them when she stated that defendant and his companion had fled. Of course, the police had to be wary in relying on her information because she might be telling the truth and acting

2. It might well be argued that the *Payton* rule, while pragmatically and rationally applicable in the arrest of nonviolent felons, obtains less cogency and relevance in circumstances where the criminal has engaged in a violent crime and possesses (or may reasonably be presumed to possess) the instrumentality used to effectuate that criminal activity. Obviously, an individual who uses a sawed-off shotgun to accomplish his misdeeds constitutes an acute continuing menace to the citizenry until apprehended.

responsibly out of civic duty, or she might be lying because of her past relationship with defendant, in which event the police might be "ambushed." Accordingly, it was incumbent upon the police to search the rooms for the presence of defendant or anyone else.

The removal of Ms. Richardson's child was, in the totality of events, a salutary action lessening tension and increasing to that extent the perimeters of Ms. Richardson's freedom in this context. The presence of the "walkie-talkies" is at best a neutral factor, not determinative on the issue of freedom of consent on Ms. Richardson's part. Further, it is common sense to expect a heightened state of excitement on the part of the participants in this unfolding drama—they are all human. The defendant and his companion(s) would be excited in their endeavor to avoid capture. The police would be excited in their attempt to arrest defendant. Ms. Richardson would be excited as a witness to and involved in the concomitant attempt to capture and attempt to escape. The issue remains —did Ms. Richardson's degree of excitement rise to such a heightened degree as to corrupt and destroy her freedom of will? Only the totality of the events as presented by the record, unimpeded by speculation, may result in an informed conclusion.

The majority do not give the People the benefit of "any creditable view" of the evidence and choose to perceive Ms. Richardson as one whose freedom of will has abdicated in favor of "awe."

The dynamics of the unfolding encounter must be viewed as a continuing and evolving whole—not as a series of isolated events. The reasonableness of the police conduct and the conduct of the nonpolice participants is to be viewed from a commonsense viewpoint. To paraphrase the apt observation on probable cause set forth in *United States v Davis* (458 F2d 819, 821), but in the context of the value judgment to be made on the issue of consent—such judgment "does not emanate from an antiseptic courtroom, a sterile library or a sacrosanct adytum, nor is it a pristine, 'philosophical concept existing in a vacuum' * * * but rather it requires a pragmatic analysis of 'everyday life on which reasonable and prudent men, not legal technicians act'." There was no threat uttered by the police to kick open the door or to break in.

Ms. Richardson did not testify at the suppression hearing. However, it is clear that hearsay evidence is admissible in a

hearing on a motion to suppress for purposes of proving the validity of the seizure (see *People v Schnitzler,* 18 NY2d 457; *People v Malinsky,* 15 NY2d 86; *People v Coffey,* 12 NY2d 443, 452; *People v Loria,* 10 NY2d 368). Apparently aware of this, defense counsel did not object to this hearsay evidence. It is well recognized that where a defendant at a suppression hearing fails to preserve the error on which reliance is now placed (on appeal) for a reversal, he may not advance such error, as the People were afforded *no* opportunity to meet the theory first put forward on the appeal (see *People v Tutt,* 38 NY2d 1011).

The Court of Appeals in the context of a motion to suppress evidence has placed the initial burden of production on the State and the ultimate burden on the defendant, except in the instance of the consent search where "the burden of proof rests heavily upon the People to establish the voluntariness of that waiver of a constitutional right," citing the statement in *Bumper v North Carolina* (391 US 543, 548): "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given" *(People v Whitehurst,* 25 NY2d 389, 391; see, also, 3 La Fave, Search and Seizure, § 11.2, subd [b]).

However, "the premise that consent searches are disfavored appears to have been rejected by a majority of the Supreme Court in *Schneckloth v Bustamonte,* 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973)" (3 La Fave, Search and Seizure, p 511).

In *Schneckloth v Bustamonte (supra,* pp 226-229) the United States Supreme Court stated: "In determining whether a [person's] will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances * * * The significant fact about all of these decisions is that none of them turned on the presence or absence of a single controlling criterion; each reflected a careful scrutiny of all the surrounding circumstances * * * The problem of reconciling the recognized legitimacy of consent searches with the requirement that they be free from any aspect of official coercion cannot be resolved by any infallible touchstone. To approve such searches without the most careful scrutiny would sanction the possibility of official coercion; to place artificial restrictions upon such searches would jeopardize their basic validity."

The court also noted the "vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment. Nothing, either in the purposes behind requiring a 'knowing' and 'intelligent' waiver of trial rights, or in the practical application of such a requirement suggests that it ought to be extended to the constitutional guarantee against unreasonable searches and seizures * * * The protections of the Fourth Amendment are of a wholly different order, and have nothing whatever to do with promoting the fair ascertainment of truth at a criminal trial" *(Schneckloth v Bustamonte, supra,* pp 241-242).

Most importantly the Supreme Court declared (pp 242-243): "Nor can it even be said that a search, as opposed to an eventual trial, is somehow 'unfair' if a person consents to a search. While the Fourth and Fourteenth Amendments limit the circumstances under which the police can conduct a search, there is nothing constitutionally suspect in a person's voluntarily allowing a search. The actual conduct of the search may be precisely the same as if the police had obtained a warrant. And, unlike those constitutional guarantees that protect a defendant at trial, it *cannot* be said every reasonable presumption ought to be indulged against voluntary relinquishment. We have only recently stated: '[I]t is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals.' *Coolidge v. New Hampshire,* 403 U. S., at 488. Rather, the community has a real interest in *encouraging* consent, for the resulting search may yield necessary evidence for the solution and prosecution of crime, evidence that may insure that a wholly innocent person is not wrongly charged with a criminal offense" *(Schneckloth v Bustamonte, supra,* pp 242-243; emphasis supplied).

The United States Supreme Court in addressing the issue of what standard of persuasion must be met by the prosecution in carrying its burden to demonstrate that the Fourth Amendment was not violated, declared: "we are unconvinced that merely emphasizing the importance of the values served by exclusionary rules is itself sufficient demonstration that the Constitution also requires admissibility to be proved beyond reasonable doubt. Evidence obtained in violation of the Fourth Amendment has been excluded from federal criminal trials for many years * * * But, from our experience over this period of time no substantial evidence has accumulated that

federal rights have suffered from *determining admissibility by a preponderance of the evidence.* Petitioner offers nothing to suggest that admissibility rulings have been unreliable or otherwise wanting in quality because *not* based on *some higher standard.* Without good cause, we are unwilling to expand currently applicable exclusionary rules by erecting additional barriers to placing truthful and probative evidence before state juries and by revising the standards applicable in collateral proceedings. Sound reason for moving further in this direction has not been offered here nor do we discern any at the present time. This is particularly true since the exclusionary rules are very much aimed at deterring lawless conduct by police and prosecution and *it is very doubtful that escalating the prosecution's burden of proof in Fourth and Fifth Amendment suppression hearings would be sufficiently productive in this respect to outweigh the public interest* in placing probative evidence before juries for the purpose of arriving at truthful decisions about guilt or innocence" *(Lego v Twomey,* 404 US 477, 488-489; see, also, *United States v Matlock,* 415 US 164, 177-178, n 14) stating that "the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence" (emphasis supplied).

Of course, "the States are free, pursuant to their own law, to adopt a higher standard" *(Lego v Twomey, supra,* p 489). However, there is no justification on policy grounds or under the circumstances herein, to adopt the higher "clear and convincing evidence" standard in place of the Court of Appeals standard of "heavy burden" (see *People v Whitehurst,* 25 NY2d 389, *supra).* The instant matter is patently distinguishable from the circumstances which occurred in *Bumper v North Carolina* (391 US 543).

"In *Bumper,* a 66-year-old Negro widow, who lived in a house located in a rural area at the end of an isolated mile-long dirt road, allowed four white law enforcement officials to search her home after they asserted they had a warrant to search the house. [The United States Supreme Court] held the alleged consent to be invalid, noting that '[w]hen a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent.' 391 U. S., at 550" *(Schneck-*

*loth v Bustamonte,* 412 US 218, 234, *supra).* To state the obvious, there is simply no comparison between the circumstances in *Bumper* and the dynamics presented by the totality of the circumstances herein.

It is noted in Ringel's Searches and Seizures (2d ed, § 9.6) that "[g]enerally the prosecution must prove voluntariness by a preponderance of the evidence. A number of states apparently use a higher standard of proof, using such phrases as 'clear and positive proof' and 'clear and convincing' evidence." New York is not cited as a jurisdiction utilizing such higher standard.

Legal scholars have from time to time expressed opinions indorsing the preponderance of the evidence standard in suppression hearings, thereby giving their imprimatur to the views of the United States Supreme Court already noted herein. For example, Professor Saltzburg declared in his article entitled Standards of Proof and Preliminary Questions of Fact: "Moreover, it is doubtful that we want to deter police officers from making arrests and searches where they could subsequently establish by a preponderance of the evidence that they acted properly" (27 Stan L Rev 271, 296-297). Another eminent authority has noted that there is no suggestion "that the states are or will be required to adopt this higher standard in such [consent] cases * * * Because the Court in *Lego* was not prepared to require more than the preponderance standard where the question to be resolved was the voluntariness of a confession, there is no reason to believe that a higher standard will be imposed when the question is the voluntariness of a consent to a search" (3 La Fave, Search and Seizure, § 11.2, pp 516-517).

It is one thing to say the People bear a heavy burden in establishing the consent by a preponderance of the evidence at a suppression hearing and quite another to declare that their burden is to establish such consent by clear and convincing evidence. The latter standard is more qualitatively an approximation of that higher standard, required at trial to prove guilt, namely, proof beyond a reasonable doubt.

The balance between freedom and security is delicate and the twin aspects of the equation are subtly interrelated. We must be careful that in our zealous appreciation of the concept that a "man's house is his castle," we do not err on the side of excess so as to destroy the balance and render his

home his prison. A home may indeed become a prison for fear to venture forth into the public ways of the city. I have had occasion to observe that "[a] society which proclaims itself free but whose citizens rightly or wrongly believe the scales of justice more noticeably 'favor' the criminal and ignore the plight of the victim and whose citizens increasingly retreat into isolation through fear that utilization of the public streets, transportation and facilities will expose them to criminal endeavors, is a society in retreat from freedom" *(People v Santiago,* 64 AD2d 355, 367).

Further examples of the subtle constraint on personal freedom generated by uncontrollable lawless elements in society may be seen in the fact that the prevalence and notoriety of traffic in controlled substances is of such proportion that even the public news media acknowledges that certain areas of our city are to be avoided by the law-abiding citizen and our own Metropolitan Transportation Authority has seen fit to issue to the public utilizing the mass transit system a brochure containing a series of "tips", in reality suggestions bordering on mandates, to aid the individual rider in safely using the system. Would not the citizen cry out in justifiable outrage if the State in its executive power constrained his freedom by directing in particular the manner of his dress—("[k]eep chains and necklaces out of sight; turn rings around so stones are on the palm side of your hand;" "[u]se a handbag that closes tightly");[3] restricted his use of public facilities in multiple particulars as to limit his access to certain public parks or parts of public parks; require that he stand at particular locations on public platforms in the transportation system; that he travel with a companion or forego the liberty of enjoying such travel; that he ride only in certain cars of the subway at certain times, etc.?

Make no mistake, tyranny may emanate from diverse sources—from an all-powerful dictatorial State; from a raging mob; from an increasingly bold criminal element in society whose criminal conduct multiplies both quantitatively and qualitatively with the passage of time. It ill behooves the citizen to reflect on the fact that the law has endeavored to preserve the sanctity of his home from criminal or unlawful conduct on the part of his fellow citizens whether arrayed with the authority of the State or against such authority,

---

3. Simple Tips To Help You Ride The Buses And Subways Safely (c) MTA (1980).

when he dare not or does not through fear, suspicion or knowledge venture forth from the confines of such home.

To tinker with the standard of the burden of proof at suppression hearings by elevating such standard to a more onerous degree in effect changes in manifold subtle aspects the delicate balance between liberty and security. Justification for such change must proceed from a most judicious and cautious reflection on the dynamic flux of contemporary society and its problems, a keen appreciation of the delicate balance between freedom and security and the need for the shift. As the burden of proof at such hearing rests on the People, the elevating of the standard required to meet that burden represents an endeavor to "brake" or constrain abuses of and threats to the equation emanating from the State. However, in the instant matter limned against the background of contemporary society and the present evolutionary state of the law, I perceive no patent abuse or threat on the State's part sufficient to warrant increasing the standard of proof required at suppression hearings and the majority agree.

On this record the People clearly met their burden.[4] Apart from this, even assuming admission of the shotgun at trial was error, it was harmless error *(People v Almestica,* 42 NY2d 222). Proof of defendant's guilt was overwhelming on this record. At trial, three of the victims of his violent criminal act positively identified defendant as one of the men who forcibly robbed them on the evening of April 11, 1978. Their testimony was compelling and convincing; was completely independent of and not tainted by the seizure of the shotgun (assuming the seizure to be unlawful) and fully implicated the defendant. As noted in *People v Almestica (supra,* p 244): "Even constitutional error may be harmless when, as in this case, it is clear, beyond a reasonable doubt, that the error did not contribute to defendants' conviction *(Chapman v California,* 386 US 18, 23-24)."

Further, while I agree with my brethren in the majority that the defendant's statement should have been suppressed,

---

4. There can be no question that Ms. Richardson voluntarily consented to the search of her apartment. On the night of the search, she repeatedly told the officers that she wanted nothing to do with defendant and that they could remove anything in the apartment that belonged to him. Indeed, it was Ms. Richardson who told the officers that defendant's belongings were in the hall closet where the double-barreled shotgun was found.

the admission of the statement (uttered by way of exculpation, not inculpation) at trial was harmless error. The nature of the statement, viewed in context with the overwhelming proof of guilt at trial, patently demonstrates that there is no "significant probability, rather than only a rational possibility * * * that the jury would have acquitted the defendant had it not been for the error or errors which occurred" *(People v Crimmins,* 36 NY2d 230, 242, involving nonconstitutional error) and that "there is no reasonable possibility that [the erroneously admitted] evidence contributed to the conviction" *(People v Almestica, supra,* p 226, involving constitutional error—the type error claimed to have occurred herein).

The other points raised by defendant on this appeal are meritless. The trial court properly compelled defendant to appear in court and defendant's claim that he was shabbily dressed did not, on this record, appear to rise to sufficient dimension to cast the slightest cloud on the truth-finding process. Defendant's contention that a victim's (Heller) in-court identification should have been suppressed is based on pure speculation that the court assumed that all three defendants would be tried together and seated together at the defense table during the trial. This argument does not present a basis to find error, especially in view of the fact that defendant was able to elicit that victim's failure to identify defendant at the lineup. Not only did two other witnesses positively identify defendant as the gun-toting perpetrator, the witness Heller had adequate time to observe the defendant during the robbery and provided the police with a description not dissimilar from that offered by the other victims, two of whom identified the defendant as aforesaid. Finally, it is also clear that the trial court did not err when it permitted the prosecutor to introduce photographs of the defendant which depicted him wearing a beard. The aspect of facial hair was relevant to the issue of identification. At trial defense witness Davis testified that defendant was not able to grow a beard. On cross-examination, to impeach credibility, the prosecutor exhibited to this witness photographs of defendant which showed him to have a beard. Defendant did not object to the introduction of the photographs into evidence at trial and for the first time, on appeal, raises the contention that a proper foundation for admission of the photographs had not been laid. Under the circumstances, such objection has not been preserved (CPL 470.05, subd 2).

Accordingly, the judgment convicting defendant of three counts of robbery in the first degree should be affirmed.[5]

FEIN, MARKEWICH and CARRO, JJ., concur with BIRNS, J. P.; LUPIANO, J., dissents in an opinion.

Judgment, Supreme Court, Bronx County, rendered on May 29, 1978, reversed, on the law and the facts, the shotgun seized by the police and the statement attributed to the defendant suppressed, and a new trial directed.

---

**5.** While the majority have predicated their reversal in this precedent-setting matter "on the law and the facts," it is my view that this determination rests "on the law" alone. We are not confronted here on the determinative issues cited by the majority with conflicting or inherently incredible testimony or with a situation where the inferences from undisputed fact may reasonably lead to differing conclusions. While heretofore the basing of the reversal "on the law and the facts" would have automatically sufficed to prevent further review by the Court of Appeals, by recent amendment to CPL 450.90 (eff Jan. 1, 1980) the exclusive control mechanism or automatic bar to further appeal by assertion of "law and facts" by the intermediate appellate court, may not frustrate the Court of Appeals exercising its own final control by a substantive evaluation of whether facts involvement or review below precludes appeal to and review by the Court of Appeals (L 1979, ch 651, § 1, which bill overrules the Court of Appeals jurisdictional impediment found in *People v Mackell*, 40 NY2d 59; see, also, *People v Mackell*, 36 NY2d 964). As noted by the clerk of the Court of Appeals, Joseph W. Bellacosa, in the Supplementary Practice Commentary to this CPL section in McKinney's: "Substance replaces form and the locus of the critical determination is switched to the Court of Appeals * * * [T]he important, the appropriate and even the notorious case with a public affect to it can at least now get to the Court of Appeals for a merits evaluation and disposition" (McKinney's Cons Laws of NY, Book 11A, CPL, 1979-1980 Cum Ann Pocket Part, p 102).