OPINION OF THE COURT
Gertrud Mainzer, J.
The respondent, Demetrius W., has been charged with acts, which if committed by an adult would constitute the crimes of burglary in the second degree, criminal mischief in the fourth degree, criminal trespass in the second degree, grand larceny in the third degree and criminal possession of stolen property in the second degree, as defined by subdivision 2 of section 140.25, subdivision 2 of section 145.00, section 140.15, subdivision 1 of section 155.30 and subdivision 1 of section 165.45 of the Penal Law of the State of New York.
*441 The respondent was arraigned in Kings County, Family Court, Intake A, on November 1, 1983 at which time the case was adjourned for a fact-finding hearing.
Prior to the fact-finding hearing, respondent moved to suppress a statement allegedly made by him to a police officer on the ground that the statement — if made at all — was the product of an unlawful arrest and was obtained in violation of his rights under Miranda v Arizona (384 US 436). Respondent also moved to suppress certain physical evidence, to wit, a black plastic bag containing items belonging to the complainant, on the ground that the property was seized as a result of an illegal arrest of respondent in his home, which was effected without an arrest or search warrant, without consent, and without any exigent circumstance justifying a warrantless arrest. Respondent claims that the seizure of the subject property from his apartment was in violation of his constitutional right to be free from unreasonable searches and seizures pursuant to the Fourth and Fourteenth Amendments of the United States Constitution and section 12 of article I of the New York State Constitution. More specifically, he claims that the seizure violates the rules set forth in Payton v New York (445 US 573), and that therefore the property illegally obtained must be suppressed.
A pretrial suppression hearing was held on March 22, 1984. At that hearing, Officer Rubin, one of the arresting officers and Mrs. W., respondent’s mother, testified. At the conclusion of the hearing the court granted respondent’s motion which sought suppression of his alleged statement, and reserved decision on the issue of whether or not to suppress the property seized in respondent’s apartment. On that issue the court directed counsel to submit memoranda of law, which were finally received by the court in June, 1984. After considering the evidence adduced at the pretrial hearing as well as the briefs submitted by counsel, the court finds for the reasons stated hereafter that respondent’s motion to suppress physical evidence seized in this matter should be granted.
FINDINGS OF FACT
On October 20, 1983, at approximately 1:50 p.m. two housing police officers, Charles Rubin and his partner, Officer Brian Lavin, received a radio run of a burglary at 375 Blake Avenue, Brooklyn. Upon arriving at 375 Blake Avenue, the officers ascertained that a burglary had occurred and that certain property including a stereo and an Atari video game were missing from the apartment of a Ms. G., the complainant herein. Two suspects were allegedly observed by an eyewitness, Mr. B., a *442 neighbor of the victim, when they were leaving the complainant’s apartment carrying a large plastic garbage bag. After meeting with the complainant and Mr. B., the police officers obtained from Mr. B., who knew the suspects, their names (Shawn and Dimmy), as well as their addresses. At approximately 2:45 p.m. Shawn was identified in the street in front of 375 Blake Avenue by Mr. B. as Sean F. and arrested. Mr. B. then led the police officers to 372 Blake Avenue, to “Dimmy’s” apartment, where the police “planned to arrest ‘Dimmy’ ”, Demetrius W., the respondent herein.
After both officers arrived at 372 Blake Avenue at approximately 2:50 p.m. with Mr. B., Officer Lavin, who did not testify, knocked at the door of apartment No. 1G while Officer Rubin stood 15 feet down the hallway. Mrs. W., respondent’s mother, opened the door a crack. Upon seeing a police officer at the door in uniform with a bolstered weapon, Mrs. W., who was home with 3 of her 12 children, asked the officer to wait while she shut the front door to lock up her barking dog to prevent him from running into the halllway. After doing so, she reopened the door a crack again. At that time, Officer Rubin asked her if Dimmy was home, and told her that a burglary had been committed, that some property was stolen and carried away in a black plastic bag, and that Dimmy might have been involved in the incident. Mrs. W., who was visibly upset and nervous, told the officer that Dimmy was home in his bedroom. According to Mrs. W.’s testimony, the police officer, who did not tell her that he intended to arrest her son, walked past her without her permission into respondent’s bedroom, where he told the respondent to “come on, you have to go with me”, and seized the black plastic bag which was in respondent’s bedroom. Neither police officer asked Mrs. W. who she was, nor asked her permission to enter the apartment. Furthermore, according to the uncontradicted testimony, neither police officer knew at the time they entered the apartment that Mrs. W. was the respondent’s mother. They ascertained this fact only later, when Mrs. W. appeared at the police precinct. After the respondent was arrested in his apartment, which fact is conceded herein, he was escorted to the police car which was parked in front of 372 Blake Avenue and was handcuffed and brought to the precinct.
Contrary to Mrs. W.’s testimony, Officer Rubin claimed that after Mrs. W. opened the door, he stepped into the doorway of the apartment and at that time the respondent who appeared in the apartment hallway was identified by Mr. B. as “Dimmy”. Thereafter, according to Officer Rubin, Mrs. W. told the respondent to bring “that stuff” and that when the respondent reappeared, he *443 carried a stereo and a black plastic bag. At that point, Officer Rubin and Officer Lavin entered the interior of the apartment, arrested the respondent and seized the subject property.
Believable testimony involves more than the witnesses’ statements and demeanor in court. The inherent probability or improbability of facts must be tested by the totality of the circumstances and ordinary rules governing human conduct. After examining the witnesses’ testimony, the court finds that Officer Rubin’s statements appeared to be tailored to nullify respondent’s constitutional objections and to overcome respondent’s claim of an illegal entry into his home. Specifically, the court finds that his testimony regarding both his entry into respondent’s home after alleged consent by Mrs. W., and his subsequent seizure of the subject property after it was allegedly brought in plain view was not only improbable, but was incredible under the circumstances of this case.
On the other hand, Mrs. W.’s testimony was believable as well as consistent. Accordingly, the court credits her testimony regarding the police officers’ entry into her apartment, her son’s arrest and the seizure of the subject property.
CONCLUSIONS OF LAW

1. Applicability of the Payton Rule to Juvenile Proceedings

Respondent contends that the physical evidence seized in his home must be suppressed because it was seized incident to an illegal arrest (Wong Sun v United States, 371 US 471) and in violation of his constitutional rights under Payton v New York (445 US 573, supra).
Petitioner, presentment agency, who opposes respondent’s motion to suppress, contends that respondent’s arrest in his apartment and the seizure of physical evidence in respondent’s apartment took place pursuant to a valid consent to enter the apartment. They contend that the police were given entry into the apartment by Mrs. W., who opened the door to them knowingly and voluntarily, and that no search took place, but, instead, that the subject property was in plain view at the time it was seized.
Absent exigent circumstances, the Payton rule prohibits the police from making a warrantless and nonconsensual entry into a suspect’s home in order to make a routine felony arrest. Both the New York State and the United States Constitutions protect one’s privacy in one’s home. (NY Const, art I, § 12; US Const, 4th, 14th Arndts.) Following Mapp v Ohio (367 US 643), which *444 recognized that the Fourth Amendment to the United States Constitution was applicable to the States, the court in Payton reaffirmed the special value the law places upon the sanctity of one’s home. In Payton, the court, quoting from Silverman v United States (365 US 505, 511), stated: “ ‘[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.’ ” (Payton v New York, supra, pp 589-590.) Thus, the court determined that a warrantless search of one’s home with very limited exceptions was unreasonable. (Payton v New York, supra, at p 586.)
The issue whether the Payton rule applies to juvenile delinquency proceedings has been raised in Matter of Lynell H. (121 Misc 2d 1005). In that case, Judge Huttner recognized (p 1006) that the “time-worn fiction that juvenile delinquency proceedings are civil in nature is moribund”, and found, following the reasoning in Matter of Gault (387 US 1) and its progeny, that in light of the vital constitutional protection afforded by the rule, no cogent argument existed which would warrant denying the extension of the Payton rule to juvenile arrests. Moreover, in finding that the Payton protection applied to juveniles, Judge Huttner (p 1007) stressed the fact that a juvenile’s reliance on the security of his home against “the real and imagined fears of the outside world” made the application of the rule’s protection to á juvenile even more fundamental than to an adult. This court agrees with Judge Huttner’s decision in Lynell H., and concludes that the Payton rule is equally applicable to juveniles before the court on delinquency charges.

2. Voluntariness of Consent to Enter a Suspect’s Home

Where a search and seizure of a person or property is allegedly based on consent, as is asserted by the presentment agency here, the People have a heavy burden of showing the voluntariness of the consent and the waiver of Fourth Amendment rights (People v Whitehurst, 25 NY2d 389; People v Rodriguez, 11 NY2d 279; Schneckloth v Bustamonte, 412 US 218; People v Gonzalez, 39 NY2d 122,128; Bumper vNorth Carolina, 391 US 543, 548-549). When examining the validity of a consent, the “ ‘courts [must] indulge every reasonable presumption against waiver’ of fundamental constitutional rights” (see Johnson v Zerbst, 304 US 458, 464), and the voluntariness of the consent must be evaluated under the totality of the circumstances (People v Gonzalez, supra; Schneckloth v Bustamonte, supra). Official coercion in whatever form, overt or subtle, excludes the finding of a voluntary consent (People v Gonzalez, supra). Thus, where there is *445 submission to authority, a consent cannot be found, nor can a consent be found from failure to argue with a police officer. (People v Gorsline, 47 AD2d 273.)
In People v Gonzales (supra, at pp 128-130) the Court of Appeals set forth several factors to be considered in determining the voluntariness of an apparent consent:
1. whether the consenter is in custody or under arrest, and the circumstances surrounding the custody or arrest;
2. the background of the consenter;
3. whether the consenter has been previously to the giving of the consents, or for that matter even later, evasive or uncooperative with the law enforcement authorities; and
4. whether a defendant was advised pf his right to refuse consent.
Applying the principles enunciated in People v Gonzalez (supra) to this case, the court cannot find that Mrs. W. freely and intelligently consented to the entry and the search which occurred herein. When the alleged consent was given, both police officers were standing at the door, in uniform and carrying bolstered guns. At that time, they intended to arrest the respondent and, according to Officer Rubin’s testimony “would not have let him [respondent] leave.” Upon encountering the police, Mrs. W., who was home with 3 of her 12 children, was visibly upset. No information concerning her background was provided. Thus, there has been no showing that she had any prior experience with the police or any prior involvement with the criminal justice system.
After asking the officers to wait while she put her dog in another room, she opened the door and the officers entered the apartment. Upon hearing that Dimmy was home, neither officer asked Mrs. W. if they could enter the apartment, nor did they tell her that she had a right to refuse them entry. In fact, neither officer told her that their purpose was to arrest Dimmy. Instead, while Mrs. W. held the door, Officer Lavin passed by her and entered the interior of the apartment. Under these circumstances, it cannot be said that Mrs. W.’s acts constituted a consent which was the unequivocal product of a knowing choice. Moreover, although Mrs. W. cooperated with the officers by opening the apartment door, her act was one of submission to authority and not an act of unconstrained choice. (See People v Rivera, 90 AD2d 778; People v Benitez, 76 AD2d 196.)
Based on the foregoing, the court finds that respondent’s arrest in his home, which was effected without a warrant and *446 without a knowing and voluntary consent to the entry was illegal. Therefore, the property seized as the result of an illegal arrest must be suppressed. (Wong Sun v United States, 371 US 471, supra.)

3. The Absence of Prepetition Arrest Warrant Procedures in the Family Court Act Does Not Invalidate the Payton Rule

In Matter of Lynell H. (121 Misc 2d 1005, supra) Judge Huttner alerted the Legislature to the fact that article 3 of the Family Court Act does not contain provisions to implement the application of the Payton rule to juvenile delinquency proceedings.* Where a consent to entry into a juvenile’s home cannot be obtained, there are no procedures under article 3 for securing a prepetition warrant for the arrest of a juvenile suspect who has returned or fled to his home. The issuance of a warrant which is governed by section 312.2 of the Family Court Act refers only to cases where a petition has been filed following a juvenile’s arrest. Prior to the enactment of article 3, adoption of the procedures of CPL 120.20 has been held to be permissible. (Matter of James A., 102 Misc 2d 670; Matter of Terry T., 90 Misc 2d 1015.) Presently, however, section 303.1 of the Family Court Act specifically prohibits this prior practice.
The absence of statutory procedures to implement the Payton rule in juvenile proceedings does not, however, excuse a violation of the Payton rule, and the absence of a mechanism in the Family Court Act to protect the constitutional rights of a juvenile”does not provide law enforcement officers with a license to violate those rights. (Matter of Gault, 387 US 1, supra; Matter of Anthony R., 119 Misc 2d 557.) Thus the court finds that pending legislative direction, the procedures suggested by respondent’s attorney, although imperfect in many respects, should be adopted to avoid future constitutional violations. Accordingly, in cases where no consensual entry into a juvenile’s home can be made to effect a felony arrest, the police may, within the confines of article 3 of the Family Court Act, choose one of two alternatives. They may cause a petition to be filed in Family Court, and request that a warrant be issued if a summons is believed to be ineffective, or they may obtain a prepetition arrest warrant in the Supreme Court, based on that court’s inherent and general powers.
In the case here, neither of these alternatives were used in order to effect a lawful arrest of the respondent in his home.
*447 For all the reasons stated herein, respondent’s motion to suppress the evidence seized in this matter is hereby granted.
The case is referred to Intake B for reassignment to a Trial Part which has not heard testimony presented in this suppression hearing.

 Judge Huttner did not have to apply the Payton rule in Matter of Lynell H. (121 Misc 2d 1005), finding consensual entry and no arrest in respondent’s home.