THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v GEORGE LASKARIS, Respondent.

Second Department, July 13, 1981

APPEARANCES OF COUNSEL

*John J. Santucci, District Attorney (Joan L. Craig* of counsel), for appellant.

*Goldberger, Feldman, Dubin & Young (Michael Young* of counsel), for respondent.

### OPINION OF THE COURT

LAZER, J.

This appeal by the People from a suppression order presents yet another example of the endless varieties of factual patterns which mandate interpretation of the Fourth Amendment. Despite the People's belated effort to justify the challenged police conduct on a theory not raised during the suppression hearing, we believe the only real issue is probable cause to arrest.

On December 20, 1977 Dino Frisone met with an undercover police officer at the latter's Queens apartment to negotiate the sale of one eighth of an ounce of cocaine. When the negotiations concluded and while still in the apartment, Frisone, who had been given a portion of the purchase price with which to obtain the narcotics, made a telephone call, but no part of the conversation was overheard. When he left the apartment, Frisone was followed by a police "tail" to a building in the vicinity of 75-10 Grand Central Parkway, which it was thought he entered. Shortly afterwards, Frisone returned to the officer's apartment with the drugs and received the balance of the price. A police check revealed that Frisone's call had been made to telephone located in apartment 2A at 76-35 113th Street. Utility records revealed that one of the two names listed for the apartment was that of Gus Laskaris, the defendant.

Nine days later—on December 29, 1977—the same undercover officer again contacted Frisone, this time proposing to purchase four ounces of cocaine for $6,000. The ensuing negotiations resulted in an agreement for a further transaction; Frisone was to receive an advance on the purchase price for which he was to return with two ounces of cocaine; at that point he was to be given the balance of the price and was to depart again and return with the other two ounces. In accordance with this arrangement, Frisone went

to the officer's apartment where he was given $1,000 in recorded money as the initial step in the sale. We now know that while still in the undercover's apartment, Frisone made a call to someone to the same apartment 2A at 76-35 113th Street, but this call was not overheard either. In any event, when Frisone left the officer's apartment, he was followed by a surveillance team to the 113th Street building, approximately one block from the building that police believed he had entered on December 20. He was then seen entering apartment 2A where he remained for approximately 20 minutes.[1] During this period no one else was seen entering or leaving the apartment, nor was anyone else seen or heard inside it.

At approximately 9:00 P.M. Frisone emerged from the building—where two officers continued to maintain constant observation of apartment 2A—entered his car and drove toward Queens Boulevard where a backup police unit blocked his vehicle and placed him under arrest. An immediate search turned up approximately two ounces of cocaine on Frisone's person and two tinfoil packets of cocaine and a quantity of marihuana in the car. The recorded purchase money was not found, however, and at this point the police did not know whether Frisone had the cocaine on his person or in his car before he entered apartment 2A or whether he had obtained the drugs in the apartment.

At approximately 9:25 P.M. four of the police officers who had participated in Frisone's arrest joined the two officers who were stationed in the hallway near apartment 2A and were informed that no one had entered or left it since Frisone's departure. The supervising officer then instructed the officers to enter the apartment for the purpose of arresting Frisone's "connection". The officers gathered at the front of the apartment door, one of them knocked, and without any words being spoken, the door was opened by the defendant. The officers announced themselves as police, and with shields displayed—and in some cases with guns drawn—rushed in and secured defendant and a

---

1. Interestingly, the People do not assert that Frisone was let into the apartment by someone inside. It is entirely possible that Frisone had his own key and let himself in.

woman friend who was with him before any consent or objection could be voiced by either individual. As the last of the six officers was entering the apartment, defendant declared: "Leave her alone [referring to the woman]. She had nothing to do with it. I'll show you where the stuff is". According to the police, the defendant was considered to be under arrest prior to making the statement. Defendant then led some of the officers to a bedroom where two or three plastic bags containing a white powder were immediately seized. After one of the officers was dispatched to obtain a warrant, the remainder of the apartment was searched, yielding various other items of evidence.

Following his indictment on a variety of drug-related charges, defendant moved to suppress his statement and all physical evidence on the ground that the search of the apartment was without probable cause, consent, warrant, or other justification. The suppression hearing, however, quickly focused upon whether probable cause to arrest existed at the time of the police entry. Although defendant did not take the stand, the hearing court granted suppression, finding that the police had forcibly entered the apartment and effectuated an immediate seizure of the individuals inside without probable cause. The court concluded that defendant's statements were the direct result of unlawful police conduct and that the causal connection between the conduct and the statements had not been sufficiently attenuated so as to dissipate the taint. The items seized both before and after issuance of the search warrant also were suppressed as fruits of the initial illegality. On their appeal, the People, for the first time, raise the contention that exigent circumstances justified the warrantless entry because there was a need to make an immediate search.

■ It scarcely bears repetition that, in the absence of exigent circumstances, the warrantless entry of a felony suspect's home for the purpose of arresting him is unconstitutional *(Payton v New York*, 445 US 573, on remand 51 NY2d 169; *People v Riddick*, 51 NY2d 764; see, also, *Steagald v United States*, 451 US 204; cf. *Michigan v Summers*, 452 US —, 49 USLW 4776). Nevertheless, this court has declared that the Supreme Court's ruling in *Payton* is not retroactive (see *People v Whitaker*,

79 AD2d 668; see, also, *People v Benitez*, 76 AD2d 196 [1st Dept holding to same effect]; *People v Graham*, 76 AD2d 228 [accord, 3d Dept]) because the rationale for the new constitutional doctrine is not founded upon considerations of overcoming " 'an aspect of the criminal trial that substantially impairs its truth-finding function' " *(Ivan V. v City of New York*, 407 US 203, 204; see *People v Getch*, 50 NY2d 456). Consequently, the instant appeal must be decided in accordance with the initial *Payton* determination in the Court of Appeals (45 NY2d 300) and CPL 140.15, both of which sanction the warrantless arrest of a felony suspect in his home upon an unembellished showing of "reasonable cause" to believe that the individual sought has committed a crime (CPL 140.10, subd 1). The recited standard is the equivalent of probable cause as the term is used in the Fourth Amendment *(People v Lombardi*, 18 AD2d 177, affd 13 NY2d 1014). In reviewing the police conduct involved here, we see no reason to disturb the hearing court's conclusion that a Fourth Amendment seizure was effectuated immediately upon entry into the apartment by the officers, at least some of whom had weapons drawn (cf. *People v Chestnut*, 51 NY2d 14). The reasonableness of that action must be measured by the facts and inferences within police knowledge at the time they crossed the threshold into the apartment itself (see *Johnson v United States*, 333 US 10; see, also, *United States v United States Dist. Ct.*, 407 US 297).

It is fundamental to Fourth Amendment jurisprudence that probable cause is that quantum of evidence which would warrant a person of reasonable caution in believing that the suspect had committed or was committing an offense *(Gerstein v Pugh*, 420 US 103; *Wong Sun v United States*, 371 US 471; *Henry v United States*, 361 US 98; *Draper v United States*, 358 US 307). "In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act" *(Brinegar v United States*, 338 US 160, 175). Probable cause to make an arrest requires far less proof than is required for conviction *(People v Miner*, 42 NY2d 937;

*People v White,* 16 NY2d 270; see *Draper v United States, supra),* but it still requires more than mere suspicion *(Brinegar v United States, supra; People v O'Neill,* 11 NY2d 148). The reasonableness of the police action depends not on " 'inchoate [or] unparticularized suspicion or "hunch", but [on] the specific reasonable inferences which [the police officer] is entitled to draw from the facts in light of his experience' " *(People v Arthurs,* 24 NY2d 688, 692; see, also, *People v West,* 44 NY2d 656; *People v Loewel,* 41 NY2d 609; *People v Oden,* 36 NY2d 382; *People v Davis,* 36 NY2d 280, cert den 423 US 876; *People v Brown,* 24 NY2d 421). Of course, the probable cause standard is no less demanding for a`warrantless arrest than it is when an arrest warrant is obtained *(Beck v Ohio,* 379 US 89; *Wong Sun v United States, supra).* That standard, simply stated, requires probable cause to believe that an offense has been committed, as well as probable cause to believe that the individual to be arrested committed it *(United States ex rel. Grano v Anderson,* 446 F2d 272, 273) or, in the language of the warrantless arrest statute (CPL 140.10, subd 1, par [b]), "reasonable cause to believe that such person has committed such crime".

Under the current circumstances, the first prong of the probable cause test has been met: the sale of cocaine by Frisone to the undercover officer makes it obvious that a crime was committed. The issue is with the second prong: whether there was sufficient cause to believe the defendant was involved in the sale. Since probable cause must be determined from the sum of the information known to the police at the time of the warrantless arrest and without the benefit of hindsight *(Beck v Ohio, supra; Wong Sun v United States, supra; Rios v United States,* 364 US 253; *Henry v United States, supra;* see, also, *Whiteley v Warden,* 401 US 560), the dispositive question is what the police knew when they entered the premises and seized the defendant.

The hearing court found, and we agree, that the only information the police had at the time of the entry to connect Frisone with the defendant's apartment derived from Frisone's December 20 telephone call which was subsequently traced to the apartment and his visit there on

December 29. The police did not know with whom Frisone had spoken during the December 20 call, nor was any part of the conversation overheard. Furthermore, since the records the police utilized listed the apartment to more than one person—and there was no information establishing who was present to take the call—there was no foundation for a conclusion that the defendant received it. We are similarly unable to conclude on the basis of the hearing testimony that when the police made their entry they knew of a December 29 telephone call to apartment 2A made by Frisone before he left the undercover officer's apartment upon receiving the $1,000 down payment which commenced that day's transaction. Viewing the testimony favorably to the People, it appears that such a call was made, but the fact that it was made is not dispositive; what is crucial is whether the arresting officers knew about the call prior to their entry into apartment 2A, for absent such knowledge there was nothing from which they could infer that anyone was present in the apartment. The testimony of the single officer questioned concerning the entering officers' knowledge of the call was at best ambiguous, and the hearing court was justified in placing no reliance on it. On this record, the People have not shown and we cannot determine that the officers knew of the call when they entered the apartment. Even if they did, they could not have known the identity of the occupant since the undercover agent did not overhear the call.

As to Frisone's visit to the apartment that day, the police knew only that he entered the apartment with marked money and departed without it, but they did not know whether he obtained the drugs found on him or in the car at the time of arrest from the apartment or whether he had the drugs before entering the apartment. The two officers stationed near the apartment door from the time of Frisone's arrival until the time of the challenged entry saw no one enter or leave, nor did they hear any noise or voices emanating from it. The officers admitted that prior to entering the apartment they had no idea as to what Frisone had done while there; how many individuals, if any, were inside; who Frisone's connection was, if any; whether the defendant was in the apartment or actually

lived there; or whether the defendant had engaged in any sale of narcotics at all. Moreover, the earlier police surveillance conducted on December 20 had led not to apartment 2A but to an address a full block away. At no time, then, had the police established a connection between Frisone and a specific occupant of the apartment, or between a specific occupant of the apartment and criminal activity. At best, any connection between the defendant and the drug activity was predicated upon conjecture that an individual in the apartment was Frisone's supplier; but there were no concrete facts which could elevate the suspicion to the probable cause necessary for the ensuing arrest (see *United States v Williams*, 604 F2d 1102; *United States v Connolly*, 479 F2d 930). To hold otherwise under these circumstances would sanction dragnet arrests of all persons present in a given place in which criminal activity is suspected, regardless of whether these individuals could be linked to any illegality (see *Johnson v United States*, 333 US 10, *supra; People v Harshbarger*, 24 Ill App 3d 335; compare *Ybarra v Illinois*, 444 US 85, and *People v Nieves*, 36 NY2d 396, with *People v Easterbrook*, 43 AD2d 719, affd 35 NY2d 913), a result plainly at odds with constitutional mandates.

Finally, our conclusion for Fourth Amendment purposes that upon entry the police immediately seized the defendant, dispenses with the need to give serious consideration to the People's newly raised contention that the existence of exigent circumstances justified a warrantless search. According to this theory, the defendant had not been seized impermissibly when he made his statement and it was induced by the mere fact of police presence rather than in response to their subjective intent to arrest him. Seized or not, however, at the suppression hearing the People shunned justification of the entry on the basis of probable cause to search[2] and relied exclusively on the warrantless arrest statutes which required a simple showing of probable

---

2. That the entry was not for the purpose of search is further borne out by the testimony that after the entry and arrest of the individuals was accomplished, the next step would be to obtain a search warrant prior to conducting any search. Subsequent events verified this procedure since after the initial seizure of the narcotics in the bedroom was made, a search warrant in fact was sought and obtained.

cause to arrest. The latter tack, of course, simplified the burden on the People, for had they attempted to justify the warrantless entry on a search theory, they would have been required to prove exigent circumstances as well as probable cause. Thus, the People successfully objected to defense counsel's attempt to elicit police testimony that part of the reason for entry was to search. Having suffered defeat on the issue of probable cause to arrest, the People may not now resuscitate the very theory which they prevented the defendant from pursuing before the hearing court (see *People v Havelka*, 45 NY2d 636; cf. *People v Payton*, 51 NY2d 169, *supra; People v Martin*, 50 NY2d 1029) and which they did not raise prior to the appeal. In any event, in determining the legality of a police entry, "it is not defendant's actions but the intent and purpose of the policeman prior to the entry that controls" *(People v Gallmon*, 19 NY2d 389, 393, cert den 390 US 911). The undisputed intent in this case was to arrest.

Because the entry and seizure of the individuals were illegal, the defendant's statements and the physical evidence were properly suppressed (see *Wong Sun v United States*, 371 US 471, *supra)*. Furthermore, under the circumstances, we cannot conclude that the defendant's statements constituted a valid consent to search the premises *(People v Gonzalez*, 39 NY2d 122; *People v Kuhn*, 33 NY2d 203). Accordingly, the order must be affirmed insofar as appealed from.

HOPKINS, J. P., GIBBONS and GULOTTA, JJ., concur.

Order of the Supreme Court, Queens County, dated February 7, 1980, affirmed insofar as appealed from.