■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RONALD R. BUFFARDI, Appellant. — Appeal by defendant from a judgment of the County Court, Nassau County (Vitale, J.), rendered August 6, 1981, convicting him of criminal sale of a controlled substance in the second degree, upon his plea of guilty, and imposing sentence. The appeal brings up for review the denial, after a hearing, of so much of defendant's pretrial omnibus motion as sought suppression of physical evidence and oral statements. Judgment reversed, on the law and the facts, plea vacated, motion insofar as it sought suppression of his oral statements to the police, and the cards and other papers seized from his person granted, motion otherwise denied, and matter remitted to the County Court, Nassau County, for further proceedings consistent herewith. The defendant was indicted for two counts of criminal sale of a controlled substance in the first degree and one count of criminal possession of a controlled substance in the third degree. Defendant moved, *inter alia,* to suppress certain physical evidence and statements he gave to the police, upon the ground that they were the fruits of an unlawful arrest made without probable cause. After a hearing, suppression was denied and thereafter defendant entered a plea of guilty to criminal sale of a controlled substance in the second degree in satisfaction of the indictment. Defendant now appeals from the judgment of conviction entered on that plea, contending that suppression should have been granted. The following facts were elicited at the hearing: On July 14, 1980, at approximately 8:10 P.M., a white 1978 Oldsmobile arrived at the Howard Johnson's parking lot in Plainview. The car was driven by Diane Bereche, the 21-year-old codefendant. Ronald Buffardi was in the front passenger seat. A second car, a blue Corvette, driven by Salvatore Buffardi, the brother of the defendant, followed the Oldsmobile into the parking lot. Earlier, in a telephone conversation, Diane Bereche had agreed to meet Officer Donald Giglio, who was then acting in an undercover capacity, at the Howard Johnson's to sell him 18 ounces of cocaine for approximately $27,000. The sale was arranged as a "two package deal". Bereche would sell nine ounces to Giglio and would have the second package no more than five minutes away. Officer Giglio informed the surveillance team, which included Officer Benner and Sergeant Hughes, of the arrangements. However, the only information transferred was the outline of the transaction and Bereche's name. There was no testimony presented at the hearing to show that Officer Giglio gave his fellow officers descriptions of Bereche, her partners or the cars which would be involved. It was agreed that

Giglio would consummate the sale at his car and that the signal of this to the team would be the opening of the car's trunk. The team would then secure the area and arrest anyone else involved in the sale. When the cars arrived, Giglio and his partner were inside the Howard Johnson's. Bereche entered and told Giglio she had the cocaine. The two officers and Bereche then went to the undercover car to complete the deal. Officer Benner and his partner had parked their car in the lot and saw Salvatore Buffardi and Bereche enter the building. The defendant remained in the white Oldsmobile in the parking lot. Benner moved his car at one point, the result of which was that he lost sight of the area for a few minutes. Upon returning to the area where he could see the white Oldsmobile, Benner noticed that it had been turned around and that the defendant was in the driver's seat. In the undercover car, Bereche gave Giglio the first package of cocaine, which had been inside a Merit cigarette carton in her purse. Giglio gave the prearranged signal and thereupon arrested Bereche and secured the package of cocaine. Upon receiving the signal, Benner and his partner approached the white Oldsmobile with their guns drawn. The defendant was placed under arrest, was taken out of the car, was frisked and handcuffed, and was taken to Benner's car. Benner put him in the rear seat. Benner advised defendant of his constitutional rights. Defendant indicated that he understood each of his rights and was willing to talk without an attorney present. Benner did not interrogate the defendant, but remained in his car with defendant while other officers searched the white Oldsmobile. During the search, Benner asked the defendant if there was "any stuff in the car * * * like cocaine or any guns or anything else". The defendant replied, "Yes * * * There is some coke under the front seat of the car on the driver's side". The defendant added that it was in a brown paper bag. Benner went to the car and retrieved a brown paper bag from under the driver's seat. Inside the paper bag was a plastic bag filled with a white powder. After arresting Bereche, Officer Giglio saw Salvatore Buffardi attempt to leave the lot in the Corvette and he instructed several other officers to stop the car. Giglio approached it and through the rear window he saw a paper bag on its rear deck. Part of a plastic bag was sticking out of the paper bag and was visible to Officer Giglio, who seized it. In response to a question from Officer Giglio, Salvatore Buffardi stated that the bag contained flour. Defendant was taken to the narcotics squad office where Sergeant Hughes, after asking defendant to confirm that he had been advised of his rights, interrogated him. Defendant said that he would co-operate and told Hughes that the cocaine had cost him $6,000 and that "I whacked * * * it with manitol." He also said that his brother, Salvatore Buffardi, "knew I was going to make a score. He thought I was a dope. What are brothers for?" Later, Officer Giglio also interrogated defendant. After Officer Benner told Giglio that defendant had been advised of his rights, Giglio asked defendant what the cocaine was cut with. Defendant replied "What you wanted me to cut it with, manitol." Giglio then asked why they had the package of flour and defendant told him that the flour was supposed to have been given first as a test to see whether they were going to be arrested. Defendant was searched and several pieces of paper and cards were taken from his pocket. We hold that the People failed to prove that the police had probable cause to arrest defendant. "It is fundamental to Fourth Amendment jurisprudence that probable cause is that quantum of evidence which would warrant a person of reasonable caution in believing that the suspect had committed or was committing an offense" (*People v Laskaris*, 82 AD2d 34, 38; see, also, *Gerstein v Pugh*, 420 US 103; *Wong Sun v United States*, 371 US 471). The arresting officer, Benner, only knew that a drug deal, which he did not witness, had occurred at the prearranged time and that it was supposed to

involve a man and a woman. He was aware of the woman's name. However, there was absolutely no testimony that he had a description of her, of her car, or of the man who was to accompany her. In fact, Benner did not maintain constant surveillance of the area. He therefore did not know if other couples had arrived during his absence. The evidence before Benner did not support a finding of probable cause. "To hold otherwise under these circumstances would sanction dragnet arrests of all persons present in a given place in which criminal activity is suspected, regardless of whether these individuals could be linked to any illegality (see *Johnson v United States,* 333 US 10 * * * *People v Harshbarger,* 24 Ill App 3d 335; compare *Ybarra v Illinois,* 444 US 85, and *People v Nieves,* 36 NY2d 396, with *People v Easterbrook,* 43 AD2d 719, affd 35 NY2d 913), a result plainly at odds with constitutional mandates" (*People v Laskaris,* 82 AD2d 34, 41, *supra*). In addition, Benner did not receive any information from any other officer that defendant was connected with the sale. Benner, therefore, did not possess sufficient knowledge to reasonably believe that defendant was involved in the criminal act. Hence, he lacked probable cause to effectuate defendant's arrest. (But see *People v Lypka,* 36 NY2d 210; *People v Horowitz,* 21 NY2d 55.) Since defendant's statements followed upon the illegal arrest almost immediately and were the direct result thereof, those statements and the cards and other papers seized from his person should have been suppressed (see, e.g., *Wong Sun v United States,* 371 US 471, *supra*). However, in regard to the cocaine seized from the white Oldsmobile which did not belong to defendant, that part of his motion to suppress was properly denied. While the unlawful arrest tainted the evidence, it is admissible under the doctrine of "inevitable discovery" (see *People v Payton,* 45 NY2d 300, revd on other grounds 445 US 573). The officers would "inevitably" have impounded the car and found the cocaine pursuant to a lawful search after Bereche's arrest. Damiani, J. P., Gulotta, O'Connor and Brown, JJ., concur.