People v McGill (2022 NY Slip Op 04762)

People v McGill

2022 NY Slip Op 04762

Decided on July 28, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:July 28, 2022

107128 113012
[*1]The People of the State of New York, Respondent,
v
Davonte McGill, Appellant.

Calendar Date:May 26, 2022

Before:Garry, P.J., Lynch, Aarons, Reynolds Fitzgerald and Ceresia, JJ.

Steven M. Sharp, Albany, for appellant.
Mary Pat Donnelly, District Attorney, Troy (George J. Hoffman Jr. of counsel), for respondent.

Ceresia, J.
Appeals (1) from a judgment of the Supreme Court (McGrath, J.), rendered October 10, 2013 in Rensselaer County, convicting defendant upon his plea of guilty of the crime of robbery in the first degree, and (2) by permission, from an order of the County Court of Rensselaer County (Sober, J.), entered August 16, 2021, which denied defendant's motion pursuant to CPL 440.10 and 440.20 to vacate the judgment of conviction and set aside the sentence.
In June 2013, defendant pleaded guilty to one count of robbery in the first degree in full satisfaction of an eight-count indictment charging him and five codefendants with murder in the second degree, robbery in the first degree (two counts), robbery in the second degree, conspiracy in the fourth degree (three counts) and criminal possession of a weapon in the fourth degree. The charges arose from the fatal stabbing of the victim in his home on February 4, 2013. The plea agreement called for defendant to be sentenced to a prison term of 12 years followed by five years of postrelease supervision. He was also required to waive his right to appeal. Thereafter, in October 2013, Supreme Court imposed the agreed-upon sentence. In July 2020, defendant moved pursuant to CPL 440.10 and 440.20 to vacate his conviction and to set aside his sentence, contending that he was incapable of understanding the plea proceeding due to the impact of a brain tumor that was not diagnosed until January 2014. The People opposed the requested relief and, following a hearing, County Court denied defendant's motion. Defendant appeals from the judgment of conviction and, by permission, from the order denying his postconviction motion.
In the context of defendant's direct appeal, the People concede — and our review of the record confirms — that defendant's waiver of his right to appeal is invalid (see People v Mallard, 163 AD3d 1350, 1350-1351 [2018], lv denied 32 NY3d 1066 [2018]; People v Pooler, 158 AD3d 935, 935-936 [2018]). As such, neither defendant's challenge to the severity of his sentence nor his claim that Supreme Court improperly failed to adjudicate him a youthful offender is precluded (see People v Williams, 202 AD3d 1162, 1163 [2022], lv denied 38 NY3d 954 [2022]; People v Gotham, 202 AD3d 1157, 1157-1158 [2022], lv denied 38 NY3d 950 [2022]).
Nevertheless,Supreme Court did not abuse its discretion in declining to accord defendant youthful offender treatment (see People v Martz, 181 AD3d 979, 980-981 [2020], lv denied 35 NY3d 1047 [2020]), norwas the negotiated sentence, which constituted a very favorable disposition, unduly harsh or severe. Although it is true that defendant was not the individual who stabbed the victim, and hecooperated in the prosecution of his codefendants and expressed remorse at sentencing, we cannot ignore the seriousness of defendant's conduct, as he played a monumental role in the premeditated ambush of the victim. With a shotgun in hand, defendant led the charge into the room [*2]where the victim was located, confronted him and started the violent robbery that ultimately led to the victim's death.
We turn next to the question ofwhat impact defendant's medical condition had on his ability to comprehend the nature of the plea proceeding. At the start of that proceeding, defendant advised Supreme Court that he did not "feel right," without further elaboration. By this point, the court had already given defendant time to speak with his sister and inquired whether he needed to talk with anyone else before going forward. Defendant indicated that he did not. A detailed plea colloquy ensued, during which defendant was questioned extensively by both the court and the Assistant District Attorney, and nothing on the face of the transcript suggests that defendant was confused or otherwise lacked the capacity to comprehend the proceeding. Rather, defendant, who assured the court that he understood what was transpiring, provided cogent responses to the questions posed to him and offered a comprehensive account of his involvement in the underlying incident.
By comparison, defendant testified at the postconviction hearing that he was experiencing migraine headaches and double vision around the time of his guilty plea. According to defendant, he had a headache during the plea colloquy and the lights in the courtroom were bothering him, as a result of which he was "confused" and his "mind wasn't all the way there." In January 2014, defendant was admitted to a local hospital. Shortly thereafter, defendant's treating neurosurgeon removed a malignant, grade 4 tumor from defendant's brain. The neurosurgeon described the tumor as "a very aggressive form of brain cancer" and indicated that, prior to its removal, the tumor and related buildup of fluid in defendant's brain could have produced symptoms such as headaches, vision changes, loss of consciousness, coordination issues and/or personality changes; such tumors also may affect one's higher cognitive function, thought processes and ability to assimilate complex information. Upon being asked when the manifestations of the tumor would have arisen, the neurosurgeon candidly testified, "I don't think anybody can really tell you." That said, the neurosurgeon noted that defendant was reporting headaches dating back to October 2013 and opined that it was reasonable to conclude that the "tumor was manifesting itself as early as" then. Notably, defendant entered his plea in June 2013, more than three months earlier. And while, in his affirmation submitted in advance of the hearing, the neurosurgeon opined "that the insidious growth of this tumor, associated with the development of hydrocephalus and increased pressure within the brain, may have caused changes in [defendant's] behavior and caused an impairment in his judgment, higher cognitive function, impulse control and reasoning — dating back to before February of 2013" (emphasis added), on this record, we cannot say that County Court [*3]abused its discretion by concluding that defendant failed to demonstrate that he was incapable of understanding or participating in the plea proceeding "by reason of [a] mental disease or defect" (CPL 440.10 [1] [e]). We are unpersuaded by defendant's assertion that the postconviction hearing failed to protect his due process rights, for this is not a situation where the court should have been alerted at the time of the plea and sentencing that defendant's fitness to proceed was questionable (compare People v Cartagena, 92 AD2d 901, 902 [1983]). Juxtaposed against the neurosurgeon's testimony is the record of the plea colloquy evidencing that defendant proceeded in a knowing and voluntary manner.
As a final matter, we disagree with the idea — advanced by the dissent — that defendant's past brain tumor warrants the reduction of his sentence in the interest of justice. In that regard, we need only note that the neurosurgeon averred that defendant "remains in remission and remains free of any active disease from [the] tumor" and that the tumor did not spread to any other areas of defendant's central nervous system. Simply stated, defendant suffers from no medical infirmity whatsoever, let alone one that would justify an early release. With respect to any potential future recurrence of the tumor, the neurosurgeon indicated that it would be "speculative" to try to say if or when that might ever happen, and even assuming that the tumor does recur at some point going forward, defendant is free to avail himself of the medical parole release procedures crafted by the Legislature in Executive Law §§ 259-r and 259-s, which prudently require a determination that the incarcerated individual seeking release poses no danger to society in light of his or her medical condition.
Garry, P.J., and Reynolds Fitzgerald, J., concur.
Lynch, J. (concurring in part and dissenting in part).
We respectfully dissent, in part. With what was known at the time of the plea and sentencing, we agree with the majority that Supreme Court acted within its discretion by imposing the negotiated sentence, without according defendant youthful offender status. On the record presented, we further agree that County Court did not abuse its discretion in denying defendant's CPL 440.10 (1) (e) motion.
That said, under the unusual circumstances of this case, we would reduce the sentence in the interest of justice. Without minimizing defendant's actual role in the criminal incident, two facts warrant particular attention. The shotgun that defendant utilized was unloaded and defendant was not in the victim's room when the stabbing took place. Defendant, who was 18 years old at the time of the incident, underwent a significant medical procedure in January 2014 to remove a malignant tumor from his brain. Defendant's neurosurgeon explained that the tumor was a "very aggressive form of brain cancer" and averred that the "[u]sual median survival with such a tumor is customarily 2.3 [*4]years," with two- and five-year survival rates of 64% and 36% respectively. As of June 2020, the neurosurgeon indicated that defendant was in remission, but noted that the tumor could recur. He further observed that defendant "is fortunate that he has not succumbed to his tumor." Given this prognosis, and considering that defendant has been incarcerated since 2013, we would exercise our interest of justice jurisdiction to modify the sentence from 12 years to time served (see CPL 470.15 [6] [b]).
Aarons, J., concurs.
ORDERED that the judgment and order are affirmed.