6

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* JAMES
MULLOOLY, Appellant.

First Department, June 8, 1971.

*William Leibovitz* for appellant.

*Herman Kaufman* of counsel (*Michael R. Juviler* with him on
the brief; *Frank S. Hogan, District Attorney*), for respondent.

McGIVERN, J. On the early evening of June 11, 1962, in the
Concourse of the Hudson Tube Terminal, the defendant, James
Mullooly, with one bullet, shot and killed Taylor S. Gay, a
vice-president of the Phillips Petroleum Company, and the
employer of Mullooly's spinster sister, Mary. Then he walked
away from the fallen body and handed over his gun to a nearby
policeman. Not a word had passed between Mullooly and Gay.
Actually, the killer had never met his victim before. Nor had
he ever seen him, except in a photograph and in his mind's eye.

He thought he knew him as "the devil", as the "Rasputin" who had seduced his chaste sister, with whom he had kept house for many years, he a bachelor and she an old maid. This had gone on since the death of their parents and two other children, a brother and a sister. First-generation offspring, James and Mary, both in their forties, were deeply religious. Of a pristine faith, at one time both had thoughts of a vocation to the religious life, he to the priesthood, she to a nunnery. He was a big man, about six feet five and weighing about 260 pounds, and although Mary was a year or so older than he, James maintained towards her the fixation of a parent. As he said during his trial for murder: "I guess maybe I was like an overfond parent".

Indicted for murder in the first degree, Mullooly refused to plead. In the *Hudson* hearing, now under review, Herman Goldberg, Esq., one of his trial counsel, testified: "He would not take the plea because he wasn't guilty of doing anything wrong. He was following God's instructions. God told him to destroy this man, and he did it".

The trial proceeded from November 26 through December 19, 1962. The defense was insanity. At various stages of the trial, Mullooly said he was God-directed:

"Q. Did God appoint anyone to punish him? A. I was under the impression that he had appointed me.

"Q. What gave you that impression? A. Well, as far as that goes, the parents are always responsible for the children, and I thought Mary was my responsibility. * * *

"A. Yes, I believed it was my duty to execute him, and I thought I was doing the will of God when I did it.

"Q. You were doing the will of God? A. That's right. I did not think I was doing anything wrong.

"Q. You didn't feel you were doing anything wrong? A. That's right.

"Q. Did you feel that when you did shoot in the direction of a human being that you were doing the right thing? A. It wasn't my shooting at a human being at all.

"Q. What were you doing? A. It was just like shooting at the devil. I had no feeling at all. * * *

"Q. Is it your testimony, Mr. Mullooly, in connection with the Commandments of the Church 'Thou shalt not kill', that you received a special dispensation from the Almighty? A. Well, to the same extent that the man up in Sing Sing has a dispensation to burn people."

Nevertheless, a jury found Mullooly guilty of murder in the second degree. The sentence was 25 years to life.

At the trial, and while the jury was being impanelled, defense

counsel requested and obtained the appointment of two psychiatrists to determine the defendant's sanity at the time of the deed, a Dr. Max Helfand and a Dr. Leonard Abrams, both of vast experience and impressive credentials. Both testified that the defendant was psychotic at the time of the shooting, that he was insane and suffered from paranoid schizophrenia. And repeatedly, both said he was then (during the trial) insane. Said Dr. Helfand: "Yes, I think he is medically insane now, and he was then". And, in the course of Dr. Abrams' testimony, there developed the following:

"Q. I will ask, I will change it to — what do you find him suffering from? A. I find him suffering from a schizophrenic reaction, paranoid type.

"THE COURT: You say this is your present diagnosis, or is this your diagnosis as of June 11th?

"THE WITNESS: It is both.

"THE COURT: Both?

"THE WITNESS: Yes".

And counsel for the defendant, during the trial, Samuel Segal, Esq., because of defendant's aberrant conduct, during summation, and even at the time of sentence, repeatedly maintained that the defendant was currently, i.e., at the time of trial, insane and visibly disoriented. True, there was contrary testimony from an equally competent psychiatrist, Dr. Morris Herman, called on behalf of the People. But he, admittedly, had never examined the defendant. And even he conceded that, suffering from "a personality disorder of the schizoid type", the defendant's schizoid qualities had "increased", and that his "condition had worsened". Still, no determination was made, nor requested, of the defendant's ability to stand trial.

Come January 22, 1970, or more than seven years after the trial, a hearing was held pursuant to People v. Hudson (19 N Y 2d 137). At this hearing, only three witnesses testified, the defendant's sister, trial counsel, Herman Goldberg, Esq., and the Trial Judge himself, called as a witness for the People. Not the psychiatrists. The Hearing Judge found that the defendant was mentally able to stand trial and denied a motion for a new trial. With this disposition we are not satisfied, and on the present state of the record under review, we tend to the view that the disposition is reversible as against the weight of the evidence, the People not having sustained their burden. (People v. Swallow, 60 Misc 2d 171; People v. Gonzalez, 20 N Y 2d 289; and People v. Di Piazza, 24 N Y 2d 342.)

In evaluating the Hudson record we must note the disproportionate space taken up by the testimony of the Trial Judge, 101

out of 134 pages, although, in effect, his testimony was his own apologia. We do not discredit it, nor do we speak of him critically, but we must accept his testimony as involving "the subjective processes of the Trial Judge", as spoken of in *People* v. *Hudson* (*supra*). And we have the impression that the Hearing Judge gave a disproportionate weight to this testimony. The District Attorney, in his brief, said that the findings of the Hearing Judge were based primarily upon the testimony of the Judge who presided at the 1962 trial. If so, such testimony was improperly determinative, as what really was at issue, was whether or not the Trial Judge should not have, *sua sponte,* ordered a contemporary hearing, at the time of the trial, as to the defendant's then capacity to stand trial. Failing that, there is a grave question as to the fairness of the trial accorded the defendant and whether a new trial is not required, because if his conviction was obtained while he was incompetent, then due process has been violated. (*Dusky* v. *United States,* 362 U. S. 402; *Pate* v. *Robinson,* 383 U. S. 375; and *People* v. *Gonzalez, supra.*)

The great gap in the record before us is the absence of any psychiatric testimony at all, although *Hudson* (19 N Y 2d 137, 140, *supra*) indicates that in the order of priority, that should come first: "The psychiatrists who made the medical examination of defendant addressed to his mental capacity at the time of trial can testify; the other medical witnesses who contemporaneously examined defendant as to his sanity at the time of the crime can testify as to their opinion as to his capacity at the trial; trial counsel for defendant, who asserted their difficulty in communicating with him, can testify as to the facts of their experience; and other contemporaneous observations by persons who saw him may be relevant."

In the absence of such critical testimony, we must presently fall back on the only other live evidence in the hearing record, other than that of the Trial Judge, that of defendant's sister and trial counsel, which sustains the defendant's position. And falling back further on the trial record (1962) we cannot ignore the categorical testimony of the psychiatrists and the statements of his trial counsel, that the defendant was then incompetent at the time of trial. Nor can we pass by the observation of the Trial Judge, in his charge to the jury, when he said: "The doctor said that he was mentally sick, that is, insane, at the time of the shooting, *and that he is mentally sick, that is insane, at the present time.*" (Italics supplied.) True, no timely request was made to have the court determine his capacity to stand trial. But this failure did not result in a waiver. It was held

in *Pate* v. *Robinson* (383 U. S. 375, 385, *supra*) " The court's failure to make such inquiry thus deprived Robinson of his constitutional right to a fair trial ". Also (*ibid.*, p. 384), " But it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently ' waive ' his right to have a court determine his capacity to stand trial. See *Taylor* v. *United States*, 282 F. 2d 16, 23 (C. A. 8th Cir. 1960) ".

In expressing these reservations as to the record before us, we realize the inherent " difficulties of retrospectively determining the petitioner's competency " (*Dusky*, 362 U. S. 402, 403, *supra*) to stand trial, when the trial occurred over seven years ago. This was feared in *Pate* v. *Robinson* (*supra*, pp. 377–378) where the trial occurred six years before, and the court concluded: " Since we do not think there could be a meaningful hearing on that issue at this late date, we direct that the District Court, after affording the State another opportunity to put Robinson to trial on its charges within a reasonable time, order him discharged." Some of the members of this Bench have already reached this same conclusion, but the majority decide there should presently be a further *Hudson* hearing, primarily calling for the testimony of psychiatrists, as mandated by *Hudson* (*supra*), if such testimony be feasible and yet available.

Accordingly, determination of the appeal from the order denying *coram nobis* relief and a motion for a new trial on the grounds of incompetency, should be withheld, and the matter is remanded to the Supreme Court, New York County, for a further and a fuller hearing in accordance with *People* v. *Hudson* (*supra*), to determine the mental capacity of the appellant at the time of trial; if such necessary psychiatric testimony is no longer available, or its development is deemed no longer feasible, thus not warranting a further hearing, a report to this effect shall be made.

NUNEZ, MCNALLY, STEUER and EAGER, JJ., concur.

Determination of the appeals from the orders (3) of the Supreme Court, New York County (MARTINIS, J.), entered on March 26, 1970, April 18, 1969 (SCHWEITZER, J.), and May 26, 1969 (SCHWEITZER, J.), respectively, unanimously withheld, and the matter remanded to Supreme Court, New York County, for a further and a fuller hearing in accordance with *People* v. *Hudson* (19 N Y 2d 137), to determine the mental capacity of the appellant at the time of trial; if such necessary psychiatric testimony is no longer available, or its development is deemed no longer feasible, thus not warranting a further hearing, a report to this effect shall be made.