THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JACK RUTHERFORD LOWE, Appellant. (Appeal No. 1.)

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JACK RUTHERFORD LOWE, Appellant. (Appeal No. 2.)

Fourth Department, July 12, 1985

**APPEARANCES OF COUNSEL**

*Edward J. Nowak, Public Defender* (*Susan K. Cable* of counsel), for appellant.

*Howard R. Relin, District Attorney* (*Wendy Evans Lehmann* of counsel), for respondent.

## OPINION OF THE COURT

DENMAN, J.

On this appeal from a judgment convicting him of two counts of murder in the second degree, robbery in the first and second degree, and petit larceny, and from an order denying his motion to vacate the judgment (CPL 440.10), defendant maintains that the competency examinations ordered by the court pursuant to CPL article 730 did not meet the statutory requirements, that he was thus deprived of due process and that he is entitled to a reversal of the judgment and a new trial. For the reasons which follow, we conclude that the judgment and order must be reversed, and a new trial granted.

Defendant was accused of murdering Harold Hoyt on the night of April 19, 1978, by stabbing him 13 times. He was also accused of the robbery and stabbing of Richard Stugis on May 2, 1978. Defendant was apprehended shortly after the Stugis incident because he had left his jacket, which contained his name, phone number and medical identification card, in the Stugis apartment. When he was interviewed by the police, defendant said that he heard voices and had to do what the voices told him.

Historically, defendant had been variously diagnosed as having a cyclothymic personality and as being manic-depressive, a paranoid schizophrenic and a catatonic schizophrenic. Defense counsel interposed the defense of not guilty by reason of mental disease or defect and requested a competency examination. Two weeks after arraignment in May 1978, the court ordered an examination pursuant to CPL article 730. Dr. Wellington W. Reynolds and Dr. J. Richard Ciccone submitted reports finding defendant incompetent to stand trial. After a second set of CPL article 730 examinations in September 1978, Dr. Reynolds and Dr. Ciccone submitted reports finding the defendant competent. A third set of CPL article 730 examinations was conducted in January 1979, by Dr. Juan Perez and Dr. Kashinath Patil who found defendant to be competent to stand trial. Finally, on April 9, 1979, the court ordered another CPL article 730 examination. Pursuant to that order only, Dr. Reynolds examined defendant on May 4 and found him to be competent. There was no second report as required by CPL 730.20 (1) and Dr. Reynolds' report was submitted by letter rather than by means of the form prescribed by statute (CPL 730.10 [8]; 22 NYCRR Appendix A-7).

Jury selection began on September 10, 1979 and continued throughout that week with defendant in attendance. After a weekend recess, jury selection was scheduled to resume on September 17, 1979. On that day, it was reported to the court that defendant refused to go to court. A hearing was held out of the presence of the jury to determine whether defendant was still competent to stand trial and whether he had waived his presence. A nurse at the Monroe County Jail stated that defendant refused to take the medication for his mental illness, refused to eat or speak and refused to go to court. A supervisor at the jail testified that, when he asked defendant if he was ready to go to court, defendant rolled over and looked at him without responding. He testified further that defendant had removed all his clothing and lay on the bed.

Defense counsel asked for another competency exam before continuing and for periodic examinations during trial. Dr. Barry, the Director of the Monroe County Mental Health Clinic, called the court to state that he could not examine defendant because he refused to speak, but, upon review of defendant's records, in his opinion, defendant was competent and voluntarily refused to appear at trial. Dr. Reynolds testified that he had seen defendant the previous Thursday and in his opinion, defendant was competent. The court made a finding of competency, ordered continuing psychiatric observation, but proceeded with the trial. Defendant never reappeared for trial and the jury returned a verdict of guilty on all counts.

## THE MOTION TO VACATE THE JUDGMENT

Defendant's appellate counsel moved to vacate the judgment pursuant to CPL 440.10 (1) (b), (f), (h). In support of the motion counsel submitted an affidavit stating that during her preparation of the appeal, she became aware that Dr. Reynolds, who conducted most of the examinations into defendant's competency and who singly performed the examination most proximate to trial, is not a "qualified psychiatrist" within the meaning of CPL 730.10 (5) (a), (b), because he is not a diplomate of the American Board of Psychiatry and Neurology and not eligible to be certified nor is he certified or eligible to be certified by the American Osteopathic Board of Neurology and Psychiatry. She averred that, in the first two examination reports prepared by Dr. Reynolds, he had represented himself as a "qualified psychiatrist" within the meaning of CPL article 730, but that in response to the examination order of April 1979, he did not use the report form mandated by statute but reported to the court by a letter indicating that he had examined defendant and found

him competent.[1] She contended that the issue with respect to Dr. Reynolds' failure to meet the statutory criteria could not be raised on defendant's direct appeal because the relevant facts do not appear in the record. The court denied the motion without a hearing, stating erroneously that this court had already determined that Dr. Reynolds is not a "qualified psychiatrist" within the meaning of the statute.[2] The court went on to state that sufficient facts would appear in the record on the direct appeal to permit this court to make a determination as to whether it would be possible to reconstruct defendant's mental capacity at the time of trial.

### THE DIRECT APPEAL

On the direct appeal, defendant contends that, since the trial took place in September 1979, the critical competency examination was the one conducted pursuant to court order of April 9, 1979 because it was most proximate to trial. In response to that order, only Dr. Reynolds conducted an examination and reported to the court by letter dated May 4, that he had examined defendant on that date and found him to be competent. That response failed to comply with the requirements of CPL article 730 in several important respects. When an order pursuant to CPL article 730 is received by the director of an appropriate mental health care facility, he is required to designate two qualified psychiatrists, of whom he may be one, to examine the defendant to determine if he is an incapacitated person (CPL 730.20 [1]). The statute further requires that the designated psychiatrists submit their examination reports upon mandated forms (CPL 730.10 [8]; 22 NYCRR Appendix A-7).

It is undisputed here that only Dr. Reynolds examined defendant pursuant to the April order. Further, his report was merely a letter stating cursorily that defendant was competent. The failure to submit the examination report upon a proper form is not merely a technical defect since the forms are prescribed so that certain information considered to be essential will be com-

1. The reporting form mandated by CPL article 730 calls for the examiner to indicate whether he is a "qualified psychiatrist" (official form DMH 704 [4-72] JC, 22 NYCRR Appendix A-7). On the first two examination reports submitted by Dr. Reynolds, he so indicated.

2. In *People v Weech* (105 AD2d 1085), we remitted the case to Trial Term for a hearing to reconstruct defendant's competency at the time of trial as contemplated in *People v Armlin* (37 NY2d 167), *People v Gonzalez* (20 NY2d 289, *cert denied* 390 US 971) and *People v Hudson* (19 NY2d 137, *cert denied* 398 US 944). Because Dr. Reynolds' eligibility under the statute was called into question, we merely stated that "[t]he fact that he may not be a 'qualified psychiatrist' (CPL 730.10, subd 5, par [a]) does not mean that his testimony may not be considered. He is qualified to state his expert opinion as to defendant's competency, subject to cross-examination" (*People v Weech, supra,* pp 1086-1087).

municated to the court to enable it to make a proper determination of defendant's mental capacity. Dr. Reynolds' letter failed to state that he was a "qualified psychiatrist" within the meaning of CPL 730.10 (5) and failed to state the nature and extent of the examination as required by CPL 730.10 (8). To compound the omissions, apparently Dr. Reynolds is not eligible to serve as an examiner pursuant to CPL article 730.

ARTICLE 730 MUST BE STRICTLY CONSTRUED

■ The procedures established by CPL article 730 are not discretionary and, once a court makes a preliminary determination that a defendant may be incapacitated, the statutory steps must be followed. "Having made the threshold determination that psychiatric inquiry was indicated, the trial court's failure to secure the second psychiatric report, as required by CPL 730.20, can hardly be viewed as an insubstantial error in light of the appellant's prior history of mental illness. Once the procedure mandated by CPL article 730 had been invoked, the defendant was entitled to a full and impartial determination of his mental capacity" (*People v Armlin,* 37 NY2d 167, 172; *People v Weech,* 98 AD2d 952). Because there were substantial deviations from the statutory requirements, defendant was deprived of a full and impartial determination of his mental capacity to stand trial.

It is fundamental that the "conviction of an accused person while he is legally incompetent violates due process * * * and that state procedures must be adequate to protect this right" (*Pate v Robinson,* 383 US 375, 378; *People v Hudson,* 19 NY2d 137, *cert denied* 398 US 944). The test to be applied is whether the defendant " 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him' " (*Dusky v United States,* 362 US 402; *see also, Drope v Missouri,* 420 US 162, 172). It was to protect defendants' due process rights in this sensitive area that CPL article 730 was enacted; its safeguards, therefore, must be diligently followed. Nor can there be a waiver of those safeguards by a putatively incapacitated defendant for "it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial" (*Pate v Robinson, supra,* p 384; *People v Armlin, supra,* p 172).

Having concluded that the strictures of CPL article 730 were substantially violated in the last critical round of CPL article 730 examinations, the question becomes whether the judgment of conviction must be reversed. The People contend that it is possible to reconstruct defendant's mental capacity at the time

of trial by means of a hearing at which the psychiatrist and others who examined, observed and treated the defendant immediately preceding and during trial can testify from records and from their recall as to defendant's contemporaneous behavior (*see, People v Armlin, supra,* p 173; *People v Gonzalez,* 20 NY2d 289, 293; *People v Hudson, supra,* p 140; *People v Wright,* 105 AD2d 1088; *People v Weech,* 105 AD2d 1085). The People urge us to adopt the course we followed in *People v Wright* (*supra*) and *People v Weech* (*supra*). In those cases we remitted the matter to Trial Term to determine whether, on the basis of such evidence, those defendants' mental capacity at the time of trial could be reconstructed. The determination of whether reconstruction is possible is contingent primarily on three considerations: (1) the extent to which there were contemporaneous psychiatric examinations, particularly for competency, but also those performed in conjunction with the preparation of an insanity defense; (2) the length of time since trial so as to determine whether witnesses at the reconstruction hearing can testify from memory rather than from records made at the time; and (3) the opportunity to observe defendant's behavior at trial to gauge the extent to which he was able to cooperate with his counsel and to understand the nature of the proceedings (*see, e.g., Pate v Robinson, supra,* p 387; *People v Armlin, supra,* p 173; *People v Gonzalez, supra,* p 293; *People v Hudson, supra,* p 140).

■ Examination of the circumstances of this case from the perspective of those factors leads us to conclude that a reconstruction hearing cannot realistically be achieved. There were contemporaneous psychiatric examinations, not only by Dr. Reynolds and others on the issue of competency, but also by Dr. Klein and Dr. Barton who examined defendant on the issue of criminal responsibility. The two considerations which militate against the likelihood of a reconstruction hearing in the present case are the length of time since trial and the lack of opportunity to observe defendant's behavior at trial. Nearly six years have now elapsed since defendant's trial. Although that length of time alone does not render reconstruction impossible per se, when viewed in conjunction with the other factors present here, it contributes significantly to our determination that the possibility of reconstruction is unlikely because potential witnesses who observed defendant at that time would, in all likelihood, have to resort to contemporaneous records rather than independent recall (*see, Drope v Missouri,* 420 US 162, *supra* [five to six years; no competency examination but other psychiatric examinations]; *Pate v Robinson,* 383 US 375, *supra* [six years; no competency examination but other psychiatric examinations];

*Silverstein v Henderson,* 706 F2d 361, *cert denied* 464 US 864 [six years; two competency examinations]).

Perhaps the most significant factor here, however, is the fact that there was no opportunity for observation of the defendant at trial. That fact alone gives rise to the additional question of whether defendant knowingly, intelligently and voluntarily relinquished his right to be present at trial. "In order to effect a voluntary, knowing and intelligent waiver, the defendant must, at a minimum, be informed in some manner of the nature of the right to be present at trial and the consequences of failing to appear for trial (see *Schneckloth v Bustamonte,* 412 US 218, 243-244; *Brady v United States,* 397 US 742, 748)." (*People v Parker,* 57 NY2d 136, 141.) Defendant's mental health was so precarious and changeable that earlier psychiatric examinations were inadequate to establish his competency at the time of trial. Inasmuch as the court was sufficiently concerned about defendant's fitness to proceed that it ordered competency examinations on four separate occasions prior to trial and continuing competency examinations during the course of trial, it would be incongruous to argue that defendant knowingly and intelligently waived his right to be present at trial.

In view of the serious flaws in the proceedings to determine defendant's competency and to determine his ability to waive his presence at trial, the only course which will insure defendant's right to a valid determination of his mental capacity to stand trial is to reverse the judgment of conviction and grant him a new trial. Because of our determination on this issue, we need not reach defendant's claims of error during the trial.

Accordingly, the judgment and order appealed from should be reversed and a new trial granted.

HANCOCK, JR., J. P. (dissenting). I respectfully dissent. On the authority of *People v Hudson* (19 NY2d 137, 140, *cert denied* 398 US 944) and our precedents in *People v Wright* (105 AD2d 1088) and *People v Weech* (105 AD2d 1085), I would reserve decision and remit the matter for a reconstruction hearing pertaining to defendant's competency to stand trial.

The rationale for the majority's decision to reverse without directing a hearing is, significantly, not that a satisfactory reconstruction is impossible but that "the possibility of reconstruction is unlikely" (majority opn, p 305). The existing possibility of a successful reconstruction, considering the profusion of available relevant evidence, should, without more, be reason enough to direct the hearing the People request. Here, as with any attempted reconstruction, it is problematical whether the

hearing court, if given the opportunity, would ultimately conclude that it has sufficient contemporaneous information on which to base a retrospective decision on defendant's competence. But it should be for the hearing court to decide, based on the evidence in the record and whatever additional proof it may take, whether there is enough on which to make a reliable determination.

Given the extensive efforts made by the trial court to ascertain defendant's competency, the vast amount of contemporaneous material in the record, the seriousness of the crime and the fact that the passage of time from trial to defendant's raising the issue cannot be assessed against the People, there appears to be no reason why the attempt should not be made. Such a course would not jeopardize the rights of the People or defendant and would entail comparatively little additional time and expense. More importantly, it would avoid the risk of holding a potentially needless retrial several years after the event and vitiating what might well be established on the hearing to have been a valid judgment of conviction. In sum, considering the record here, if there is a chance of success in reconstruction, does it not seem sensible to try it? But aside from that, I cannot accept the premise on which the majority bases its rejection of a hearing: that reconstruction, while not impossible, is unlikely. The record supports the opposite conclusion.

The majority assigns two factors "which militate against the likelihood of * * * reconstruction": the length of time since trial and the lack of opportunity to observe defendant's behavior at trial (majority opn, p 305). These factors, taken alone or together, do not compel the result the majority reaches. And, compared with similar cases where hearings have been directed (*see, People v Armlin,* 37 NY2d 167; *People v Gonzalez,* 20 NY2d 289, *cert denied* 390 US 971; *People v Hudson, supra; People v Wright, supra; People v Weech, supra; People v Vallelunga,* 101 AD2d 603; *People v McCabe,* 87 AD2d 852; *People v Ross,* 50 AD2d 1064), the record here reveals an availability of far more expert and other evidence on which a competency determination could be based.

The record shows that the following evidence could be adduced at a hearing:

(1) Testimony from the four psychiatrists (Drs. Reynolds, Ciccone, Patil and Perez), who conducted four separate competency examinations pursuant to various orders of the court.[1]

---

1. On May 26, 1978, at defense counsel's request, the court ordered that defendant be examined as to competency. On July 11, 1978, it received reports

308

(2) Testimony from two additional psychiatrists (Drs. Barton and Klein, who testified at trial on the defense of insanity) concerning their opinions and observations made during interviews with defendant on various dates within one month prior to trial.[2]

(3) Testimony of personnel at the Rochester Psychiatric Center as to their observations of defendant during the period of defendant's admission (May 21, 1979 — July 9, 1979) and hospital records and other documentary evidence relating to that admission.

(4) Testimony of personnel from the Monroe County Mental Health Clinic who observed defendant from the time of his discharge from the Rochester Psychiatric Center through the end of the trial.[3]

(5) The record of the competency hearing conducted by the trial court on September 17 and 18, 1979, at which Marilyn Giannavola, Corporal Willie C. Brown, and Dr. Reynolds testified as to defendant's conduct and competence at the time.

(6) Testimony of the Trial Judge, defense counsel, the prosecutor, the court reporters, court attendants, and anyone else who may have observed defendant's conduct during those times when he was present in court.[4]

(7) Testimony from Dr. Reynolds as to his observations and opinions of defendant's competence made in connection with his

of Drs. Reynolds and Ciccone stating that defendant was incompetent. On August 3, 1978, a second set of competency examinations was ordered, and the court thereafter received reports from Drs. Reynolds and Ciccone finding defendant competent. After a third set of competency examinations was ordered on January 3, 1979, reports were received from Drs. Patil and Perez stating that defendant was competent. Following a direction for a final set of competency examinations, the court on May 4, 1979 received a letter from Dr. Reynolds finding defendant competent.

2. Defendant was interviewed twice by Dr. Barton (who testified for the prosecution at trial), and both interviews were transcribed by a court reporter. On September 6, 1979, defendant was examined by Dr. Klein, who testified for the defense. Significantly, at trial, Dr. Klein testified that during the September interview, defendant was oriented and coherent.

3. At trial, records from the Monroe County Mental Health Clinic for the period of September 12, 1978 up to and including August 1, 1979 were received. Carol Saginaw, a psychiatric social worker, observed the defendant when defendant initially absented himself from the proceedings, and Dr. Reynolds observed defendant continuously through trial.

4. Defendant was present before the trial court while various pretrial hearings were conducted on August 16 and 17, 1979, less than one month before trial, and for a continuous five-day period while the jury was being selected and at the time of sentencing. The record shows that defense counsel consulted with his client during jury selection, and there is no indication that defendant at any time exhibited erratic or other abnormal behavior in court.

court-ordered biweekly reports as to defendant's competency during the time that defendant was absent from trial.

(8) Testimony of defense counsel who saw defendant during trial, while defendant was absent, and testimony of jail personnel as to defendant's conduct during this period.[5]

I turn briefly to the first factor which in the opinion of the majority makes "the possibility of reconstruction * * * unlikely" — lapse of time since trial. Little comment is required. As the majority notes (majority opn, p 305), that factor, standing alone, is not determinative. It must be considered together with the extent of contemporaneous examinations and observations by psychiatrists (both in connection with competency determinations and for the purposes of the insanity defense) and other "medical proof related to conditions at the initiation and during the progress of the trial, and of the close observations of witnesses who, from different points of vantage, observed defendant and could describe his conduct" (*People v Hudson,* 19 NY2d 137, 140, *supra*). Considering the mass of available relevant proof as to defendant's capacity and the periods of time between trial and remittitur for hearings in comparable cases (*see, e.g., People v Weech,* 105 AD2d 1085, *supra* [five years]; *People v Mullooly,* 37 AD2d 6 [eight years]), the elapsed time here — less than six years — certainly does not appear to warrant the foreclosure of any attempt at reconstruction.

Nor, in the light of the total record, should the majority's second factor — defendant's absence from trial after the fifth day of jury selection — present an obstacle to reconstruction. A hearing court could determine whether defendant "was able to cooperate with his attorney and * * * understand the nature and object of the proceedings against him" (*Drope v Missouri,* 420 US 162, 181) from the testimony of the trial court, the lawyers, court attendants and others concerning defendant's demeanor during the seven days he was present in court (*see,* n 4, p 308, *supra*) and from the testimony of Dr. Reynolds, defense counsel and jail personnel as to their observations of defendant while he was absent from the trial. Whether this together with the other evidence available is sufficient should be for a hearing court to determine.

That there were flaws in the CPL article 730 proceeding, as in all cases where reconstruction has been directed, goes without saying. As we noted in *People v Weech* (*supra*), while it is not possible to duplicate a CPL article 730 proceeding after the

---

**5.** Defense counsel stated at one point during the trial that he had spoken to defendant and that defendant had relayed to him confidential information.

event, "it is possible to reconstruct the mental capacity of defendant at the time of trial through an adversary inquiry and thus preserve '[a]ll the safeguards of a concurrent determination' (*People v Hudson,* 19 NY2d, at p 140)" (*People v Weech, supra,* p 1086). With respect to the defect in the proceedings due to Dr. Reynolds' lack of statutory qualifications, we observed in *Weech* that at the hearing "it would be appropriate to introduce the testimony of Dr. Reynolds. The fact that he may not be a 'qualified psychiatrist' (CPL 730.10, subd 5, par [a]) does not mean that his testimony may not be considered. He is qualified to state his expert opinion as to defendant's competency, subject to cross-examination. Should the court deem it necessary, it may call an additional qualified psychiatrist. Similarly, the psychiatrist who examined defendant in connection with his defense of insanity could be called upon to testify with respect to defendant's mental status at the time of his examination. Additionally, the psychiatric social worker and psychiatric nurse who observed defendant could be called upon to testify as could defense counsel and the Trial Judge (see *People v Hudson, supra,* p 140)" (*People v Weech, supra,* pp 1086-1087). The same procedures could be followed here.

To be sure, success in reconstruction, if it were ordered, would not be certain. It can never be. On this record, though, success seems likely and, in my opinion, in fairness to all concerned, the attempt should be made.

GREEN, O'DONNELL and PINE, JJ., concur with DENMAN, J.; HANCOCK, JR., J. P., dissents and votes to hold the case, reserve decision and remit for further proceedings in a separate opinion.

Appeal No. 1 — Judgment reversed, on the law, and a new trial granted.

Appeal No. 2 — Order reversed, on the law, and a new trial granted.