THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DONALD ARNOLD, Appellant.

Fourth Department, November 15, 1985

### APPEARANCES OF COUNSEL

*Rose H. Sconiers (Carolyn Balowitz* of counsel), for appellant.

*Richard J. Arcara, District Attorney (Rosemarie Wyman* of counsel), for respondent.

### OPINION OF THE COURT

SCHNEPP, J.

On February 8, 1982 defendant confessed to the Buffalo police that he had stabbed Susan Mostilla, who died as the result of four stab wounds in the vicinity of her heart. He was tried and found guilty by a jury of first degree manslaughter and on October 21, 1982 he was sentenced to an indeterminate term of 12½ to 25 years. Following a hearing on September 11, 1984, at which it was found that the court had improperly

determined that he was a second felony offender, defendant was resentenced to an indeterminate term of 8⅓ to 25 years.

The chief issue on appeal is whether the trial court should have *sua sponte* ordered a psychiatric examination of defendant pursuant to CPL 730.30 (1) to determine his competency to stand trial, and, if so, whether reversal and a new trial are required or whether decision should be reserved and the matter remitted to the trial court for a hearing to determine if sufficient evidence is available to reconstruct the defendant's mental capacity at the time of trial and, if so, to determine whether defendant was an incapacitated person.

It is fundamental that the trial of a criminal defendant while he is mentally incompetent violates due process *(Pate v Robinson,* 383 US 375). The test to be applied is whether the defendant " 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding— and whether he has a rational as well as factual understanding of the proceedings against him' " *(Dusky v United States,* 362 US 402; *see also, Drope v Missouri,* 420 US 162, 172). To safeguard this right the Supreme Court announced in *Pate v Robinson (supra)* a corollary "procedural due process right to a competency hearing whenever the facts or events presented to the trial court raise a bona fide doubt as to a defendant's competency." *(People v Harris,* 109 AD2d 351, 355.) In such instance the trial court must *sua sponte* conduct an inquiry into his mental capacity *(Pate v Robinson,* 383 US 375, 385, *supra).* As articulated by the Court of Appeals in *People v Smyth* (3 NY2d 184, 187), "[i]f at any time before final judgment in a criminal action it shall appear to the court that there is a reasonable ground for believing that a defendant is in such state of idiocy, imbecility or insanity that he is incapable of understanding the charge, indictment or proceedings or of making his defense, it is the *duty* of the court to direct him to be examined in these respects" (emphasis added; *see also, People v Armlin,* 37 NY2d 167, 171). This duty is codified in CPL 730.30 (1) which vests the court with discretion to determine on its own motion the need for an examination of the defendant's fitness to stand trial.

In determining whether a trial court should have invoked the procedures of CPL article 730 and directed an examination and hearing on defendant's competency, the focus is on what the trial court did in light of what it knew or should have known of the defendant at any time before final judgment *(see, Pate v Robinson,* 383 US 375, 385, *supra; People v*

*Armlin, supra,* p 171; *People v Harris,* 109 AD2d 351, 355, *supra; see also, Hance v Zant,* 696 F2d 940, 948, *cert denied* 463 US 1210; *Lokos v Capps,* 625 F2d 1258, 1261; *Reese v Wainwright,* 600 F2d 1085, 1093, *cert denied* 444 US 983). The test to be applied has been formulated as follows: "Did the trial judge receive information which, objectively considered, should reasonably have raised a doubt about defendant's competency and alerted him to the possibility that the defendant could neither understand the proceedings or appreciate their significance, nor rationally aid his attorney in his defense." *(Lokos v Capps, supra,* p 1261; *People v Harris, supra,* p 355.) Neither the Supreme Court nor our Court of Appeals have articulated precise guidelines to assist the court in determining when to order a hearing *sua sponte* on the issue of the defendant's competence to stand trial. There is no doubt that the trial court must be alert to signs of incompetency from a variety of sources. "[T]he question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." *(Drope v Missouri,* 420 US 162, 180, *supra.)* Case law in this area has focused on three factors which should be considered, including (1) the existence of a history of irrational behavior, (2) defendant's demeanor at trial, and (3) any prior medical opinion on his competence to stand trial *(Drope v Missouri,* 420 US 162, 180, *supra; Hance v Zant,* 696 F2d 940, 948, *supra; Lokos v Capps,* 625 F2d 1258, 1261, *supra; Reese v Wainwright,* 600 F2d 1085, 1091, *supra).* Written reports of the defendant's condition, his statements and appearance during the proceedings, statements of defense counsel or even a presentence report, standing alone, may trigger the obligation to order an examination "even though the question of defendant's competency was not otherwise raised at any time during the criminal proceedings." *(People v Armlin,* 37 NY2d 167, 171, *supra; see, People v Bangert,* 22 NY2d 799; *People v Gonzalez,* 20 NY2d 289, *remittitur amended* 20 NY2d 801, *cert denied* 390 US 971; *People v Cartagena,* 92 AD2d 901.)

In our view there was sufficient indicia of mental incapacity to trigger the trial court's obligation to order a fitness examination of defendant at the time of trial. On September 7, 1982 defendant appeared in court with counsel seeking an adjournment of the trial on the ground that he was neither physically nor emotionally ready for trial. After defense counsel explained that defendant was suffering from "some form of palsy", the court acknowledged that it was "obvious * * * that

the defendant is experiencing some difficulty". The court then ordered that defendant be given medical attention and instead of granting defendant's request for an adjournment decided to await a medical report on defendant's condition before determining whether a postponement of the trial was necessary.

Defendant and counsel next appeared in court on September 13, 1982. In commenting on the defendant's medical condition, the Trial Judge explained that evaluations of defendant indicated that he had the ability to control his "shaking". It was evident that defendant was shaking while being addressed by the Judge. However, the Judge explained that earlier in the day he had observed that defendant was not "shaking" while sitting in the "prisoner's box". The defendant then stated that he was "just nervous". The Judge determined that the trial should not be adjourned and scheduled a *Huntley-Mapp* suppression hearing for the following day. Defendant was thereafter tried, convicted and sentenced.

It is apparent from the remarks of the Trial Judge on September 13, 1982 that he had been furnished with an Erie County Holding Center inmate medical report which detailed the treatment provided to the defendant during his pretrial incarceration and earlier. This report is a part of the record on appeal before us. A 1981 entry in this report, from a prior incarceration, showed that Dilantin and phenobarbital had been prescribed for defendant. A February 10, 1982 entry in this report, two days after defendant had been jailed, indicated that defendant "had no psychotic symptoms at this time", but that he had "a history of inpatient psych treatment". The report further indicated that Valium, Haldol and Artane had been prescribed for defendant while he awaited trial on the manslaughter charge. In a June 2, 1982 entry defendant was described as "somewhat confused", and quoted as stating that he was an "alcoholic". The June 2 report also indicated that a deputy had reported that defendant seemed to be "hearing voices" and had been "walking around talking in a very loud voice". A June 8, 1982 entry indicated that the medication was having a "stabilizing" effect on defendant. However, on June 15, he was "visibly shaking" and his "mouth was dry". Defendant was also shaking on June 21 and June 24, but five examinations conducted between July 2 and August 16, 1982 indicated he was "doing better". However, defendant's "shaking" resumed and was observed on four occasions between August 30 and September 10, 1982. Never-

theless, during the September 10 medical examination, defendant stated that he could control his shaking.

In addition to these pretrial indications of possible psychosis, the presentence report disclosed that based on defendant's statements he is an epileptic, an alcoholic, that he suffered a serious head injury in his 20's (apparently a serious skull fracture received in military service during the Korean War) and that he had a history of treatment for mental health problems including admissions to the Buffalo Psychiatric Center in 1964 and 1966 and Mid-Hudson Psychiatric Center in 1977. The report confirmed defendant's admissions to the Buffalo Psychiatric Center and stated that a prior felony prosecution in 1973 was halted when it was found that defendant was "incapacitated-mental defect" and he was committed to Mid-Hudson for three months.

On October 21, 1982 defendant was sentenced as a second felony offender on the basis of a CPL 400.21 statement alleging that he was convicted of third degree burglary in 1973. In response to the trial court's inquiry the defendant stated that he did not disagree with anything in the CPL statement.

Following defendant's appeal from his conviction, we granted him permission on February 21, 1983 to prosecute his appeal as a poor person. Subsequently, the Legal Aid Bureau of Buffalo was appointed as appellate counsel. Defendant's appellate counsel interviewed defendant and his mother and discovered several apparent discrepancies between their versions of his past. A major error uncovered by counsel was that, contrary to defendant's admission to the sentencing court that he was convicted of a felony in 1973, he was in fact convicted only of criminal trespass, a misdemeanor, after he was released from the Mid-Hudson Psychiatric Center. Following the granting of a CPL 440 motion defendant was resentenced on September 11, 1984.

At the resentencing hearing before the same Trial Judge, defendant's appellate counsel reported that she had also learned that defendant had spent the first 1½ years of his original sentence in mental illness treatment facilities operated by the Department of Correction and that he was only placed in Attica in March 1984. Appellate counsel also related her belief to the court that, as a result of her conversations with defendant's mother, much of the personal information contained in the presentence report and obtained from the defendant was imagined and reflected his inability to accept

reality. She pointed out that while the presence report indicates that defendant believes he has three children including a 23-year-old son by the victim, in reality, her investigation revealed that defendant never had any children and that he is not capable of having children as a result of his war injuries. In the presence report defendant is quoted as stating to the Probation Department that he was discharged from the Army for striking an officer in the head with a chair. However, according to defendant's appellate counsel his mother stated that this was "untrue" and that defendant apparently "simply wandered away" from Fort Benning, Georgia, and was discharged for his disappearance. Appellate counsel also related to the Trial Judge that her investigation disclosed that defendant has a history of periodic lapses or spells when he simply wanders away from home, that at these times he apparently does not know where he lives and that he has been hospitalized for exposure when he wandered off during the winter season.

In our view, the information available to the Trial Judge at least at the time of final judgment, i.e., at the resentencing in September 1984, "objectively considered, should reasonably have raised a doubt about the defendant's competency and alerted him to the possibility that the defendant could neither understand the proceedings or appreciate their significance, nor rationally aid his attorney in his defense" *(People v Harris,* 109 AD2d 351, 355, *supra)* and that a competency hearing was required. Defendant's appearances before the trial court, his failure to controvert the People's claim that he was a second felony offender, the pretrial inmate medical report indicating ongoing psychiatric observation and treatment, the presence report revealing a history of mental illness and incompetency, and appellate counsel's investigation showing treatment for mental illness in prison and disputing the personal information about defendant contained in the presence report should have made the trial court aware of the possibility that defendant may have been incompetent to stand trial. Moreover, the presence report advised that defendant had been followed in jail by the Forensic Psychiatric Service and that a report of this treatment had been requested for inclusion in the presence report. However, no such report was added to the presence report prior to sentencing in 1982 or resentencing in 1984. This omission should have warned the Trial Judge that he should have

delayed sentencing until he had received a complete presentence report.

Having made the threshold determination that the trial court abused its discretion in failing to order an examination of the defendant's competency, we must consider whether the requirements of CPL 730.20 (examination by two qualified psychiatrists) and CPL 730.30 (a hearing to determine the issue of capacity) may be satisfied by a reconstruction hearing. It is well settled that, "although it is impossible to have a posttrial article 730 proceeding, it is possible to reconstruct the mental capacity of defendant at the time of trial through an adversary inquiry and thus preserve '[a]ll the safeguards of a concurrent determination' *(People v Hudson,* 19 NY2d, at p 140). Such adversary hearing then becomes the functional equivalent of a pretrial article 730 proceeding" *(People v Weech,* 105 AD2d 1085, 1086; *cf. People v Lowe,* 109 AD2d 300). A nunc pro tunc competency hearing is constitutionally permissible as long as a meaningful inquiry into the defendant's competency can still be made *(Pate v Robinson,* 383 US 375, *supra; Hance v Zant,* 696 F2d 940, 948, *supra; People v Hudson,* 19 NY2d 137, *cert denied* 398 US 944). This must be accomplished by means of contemporaneous observations and records. If such a meaningful inquiry is no longer possible, the defendant must be retried, if presently competent, or released *(Hance v Zant, supra).*

"The determination of whether reconstruction is possible is contingent primarily on three considerations: (1) the extent to which there were contemporaneous psychiatric examinations, particularly for competency, but also those performed in conjunction with the preparation of an insanity defense; (2) the length of time since trial so as to determine whether witnesses at the reconstruction hearing can testify from memory rather than from records made at the time; and (3) the opportunity to observe defendant's behavior at trial to gauge the extent to which he was able to cooperate with his counsel and to understand the nature of the proceedings" *(People v Lowe,* 109 AD2d 300, 305, *supra).*

In considering elements (2) and (3), the length of time since trial is not unduly long (3 years) *(see, e.g., People v Gonzalez,* 20 NY2d 289, *supra* [3 years]; *People v Wright,* 105 AD2d 1088 [3 years]) and there was sufficient opportunity for observation of the defendant at trial *(compare, People v Lowe,* 109 AD2d 300, 306, *supra),* although defendant's trial counsel is deceased. While there were no contemporaneous psychiatric

examinations to determine competency as such, the record suggests the possibility that defendant might have been examined by a psychiatrist before trial while detained in the Erie County Holding Center. The remarks on defendant's inmate medical report show that on June 2, 1982 a Dr. Prasad was contacted regarding defendant's condition and that he prescribed Haldol and that on September 10, 1982 the infirmary "contacted Dr. Liebergall from Forensic" who is identified in defendant's brief as a psychologist. There is no notation of any examination by Dr. Liebergall. Moreover, the presentence report states that although the probation services received no response from its September 29, 1982 referral to the Forensic Psychiatric Service, Buffalo, New York, for a final report for sentencing, the "agency had been seeing the defendant in the Erie County Holding Center". In addition, after defendant was sentenced and placed in the custody of the Department of Correction in October 1982 he was allegedly treated in various mental hygiene programs.

Thus, the possibility exists that, since the Forensic Psychiatric Service "had been seeing" defendant in the Erie County Holding Center, he was examined by a psychiatrist attached to that agency after he was first arrested on the murder charge. Moreover, defendant was probably examined by a psychiatrist shortly after he was first sentenced and may have been receiving psychiatric treatment until he was transferred to the Attica Correctional Facility. While the purpose of any such examination would not have been to evaluate defendant's competency to stand trial, these experts may be able to render an opinion regarding defendant's fitness for trial *(but see, People v Peterson,* 40 NY2d 1014).

Accordingly, decision should be reserved and the matter remitted to the trial court before a different Judge for a hearing to determine if sufficient evidence may be developed to reconstruct defendant's mental capacity at the time of trial and, if so, to decide whether defendant was an incapacitated person, in which event the People have the burden of proving defendant's mental competence by a fair preponderance of the evidence *(People v Wright,* 105 AD2d 1088, *supra).*

HANCOCK, JR., J. P., DOERR, GREEN and O'DONNELL, JJ., concur.

Case held, decision reserved and matter remitted to Erie County Court for further proceedings, in accordance with the opinion by Schnepp, J.